Mary McCLURE and Gary Kemp, Plaintiffs,

v.

AMERICAN FAMILY MUTUAL INSUR-ANCE COMPANY, American Standard Insurance Company of Wisconsin, American Family Life Insurance Company, Wisconsin corporations doing business in the State of Minnesota, David N. Krueger, Daniel DeSalvo, Harvey Pierce, and Dale Mathwich, Defendants.

No. CIV. 97–1225 DSD/MM.

United States District Court, D. Minnesota.

Dec. 10, 1998.

Jeffrey R. Anderson, Joanne J. Mullen, and Reinhardt & Anderson, St. Paul, MN, for plaintiffs.

Cory L. Bettenga, and Fredrikson & Byron, Minneapolis, MN, and David P. Jendrzejek, Paul J. Yechout, and Moss & Barnett, Minneapolis, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendants American Family Mutual Insurance Company, American Standard Insurance Company of Wisconsin, American Family Life Insurance Company, David N. Krueger, Daniel DeSalvo, Harvey Pierce, and Dale Mathwich for summary judgment. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants in part and denies in part defendants' motion.

## BACKGROUND

Plaintiff Mary McClure is a resident of Nicollet County in the State of Minnesota.

Plaintiff Gary Kemp is a resident of Dakota County in the State of Minnesota. Defendants American Family Mutual Insurance Company, American Insurance Company of Wisconsin, and American Family Life Insurance Company (hereafter collectively referred to as "American Family") are affiliated Wisconsin corporations operating under common management and control with their principal places of business in Wisconsin. All three companies are licensed to sell insurance in the State of Minnesota. Defendants David N. Krueger, Daniel DeSalvo, Harvey Pierce and Dale Mathwich are residents and citizens of the State of Wisconsin. Defendant Krueger at all relevant times was employed by American Family as Northwest Regional Vice President.[1] Defendant DeSalvo was employed as Executive Vice President. Defendant Pierce was employed as President and Chief Operating Officer. Defendant Mathwich served as Chairman of the Board and Chief Executive Officer. The court's jurisdiction in this matter is based on diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332.

American Family sells multiple lines of insurance, including property and casualty insurance, auto insurance, life insurance, and multiple commercial lines. American Family sells this insurance through exclusive agents, who have individual agency agreements with American Family and are classified as independent contractors. The agents sell only American Family policies, and are required to sell all lines of the forementioned types of insurance.

Plaintiff Kemp entered into an agency agreement with American Family on or about September 12, 1967, whereby Kemp agreed to act as an American Family exclusive agent. The Kemp agency contract was most recently modified by agreement effective January 1, 1996. Plaintiff McClure entered into an agency agreement with American Family on or about August 1, 1986, whereby McClure also agreed to act as an American Family exclusive agent. The McClure agency contract was most recently modified by agreement effective January 1, 1993.

During their relationship with American Family, both plaintiffs were active participants in the American Family Agents' Association (hereafter "Association"). At the time of his termination, Kemp served as president of the National Association. McClure served as a board member of the Minnesota Association and was chair of the National Association Legislative Committee. American Family's unwritten corporate policy was to not recognize the Association. Deposition of Gary Hammer, Exhibit 1 to Affidavit of Harvey Eckart (Docket No. 21) at 42. One of the Association's primary activities was lobbying the Minnesota legislature on insurance issues. Of primary importance in this case is the Association's support of the "Quota Bill," which prohibited insurance companies from imposing on independent agents a requirement that the agent sell a specified number or dollar amount of life or health insurance policies in order to sell more profitable property and casualty insurance. When the Quota Bill was introduced in the 1995 legislative session, American Family opposed an amendment to include in the bill exclusive agents such as those selling American Family products, and the amendment was rejected. In the fall of 1995, plaintiffs met with Dominic Sposeto, a registered contract lobbyist, and hired him to represent the Association in lobbying the Minnesota legislature in favor of a Quota Bill to cover exclusive agents in the next legislative session. Sposeto, in late 1995, met with Vicky Rizzolo and William Dooley of American Family's governmental affairs department to discuss the quota issue and his intended lobbying efforts.

On approximately January 8, 1996, Rizzolo informed defendant Krueger that Kemp and McClure, on behalf of the Association, had retained Sposeto. On January 11, 1996, Krueger and District Manager Al Baumgartner visited Kemp at his agency office, informed him of his termination, and served him with his termination letter, which read:

Your Agents Agreement with American Family Insurance Company is being termi-

---

1. To the extent it may be relevant, Krueger became Great Lakes Regional Vice President in

1996. *See* Answer (Docket No. 2) at ¶ 4.

nated immediately for conduct prejudicial to the company. You have ten days to turn over your files and other materials, as required by your Agreement, to your District Manager.

A letter from Agency Services will be following explaining these and other obligations under your Agency Agreement.

Letter from David Krueger to Gary Kemp, Exhibit 3 to Affidavit of Harvey Eckart (Docket No. 21) at P 189. The conduct deemed "prejudicial to the company" was retention of a lobbyist to support an agenda "in direct conflict with the company." Deposition of Vicky Rizzolo, Exhibit 2 to Affidavit of Harvey Eckart (Docket No. 21) at 36–37. Also on January 11, 1996, McClure was visited at her home by her District Manager, Derwin Dugger, and Minnesota South State Director Gary Hammer. McClure was also informed of her termination and served with her termination letter.[2] No other documents or explanation were given to plaintiffs at this time.

Plaintiffs' termination received coverage in the press. American Family spokesman Rick Fetherston was quoted in articles appearing in the Milwaukee *Journal Sentinel* and Manitowoc–Two Rivers *Herold Times Reporter.* In addition, Gary Hammer wrote a letter that was published in the Mankato *Free Press* discussing the terminations. American Family also sent internal communications to other American Family agents discussing the terminations, and sent a letter to plaintiffs' former clients which plaintiffs contend was misleading and implied improper behavior on their part. Finally, plaintiffs allege that American Family issued a public statement accusing plaintiffs of engaging "in a pattern of disruptive and disloyal activities over a period of years." Complaint (Docket No. 1) at ¶ 28. This statement was allegedly quoted in a number of newspapers. The contents of all these communications will be discussed more fully below as relevant to plaintiffs' claim for defamation.

Plaintiffs instituted this action on or about April 29, 1997, in Ramsey County District Court, alleging defamation (Count I), wrongful termination in violation of public policy (Count II), tortious interference with contract (Count III), intentional interference with prospective contractual relations (Count IV), violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.44 (Count V), fraud and intentional misrepresentation (Count VI),[3] and breach of contract (Count VII).[4] The allegations in Counts I, II, IV, V, VI, and VII are made against American Family. The allegations in Count III are made against the four individual defendants. Defendants filed their Notice of Removal to this court on May 19, 1997, pursuant to 28 U.S.C. § 1441, and now bring this motion for summary judgment. After oral argument, this matter is properly before the court for decision.

## DISCUSSION

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.

---

**2.** Although McClure's termination letter is not present in the record, it appears from the allegations in the Complaint that the contents of that letter were similar if not identical to the letter presented to Kemp.

**3.** In its response to defendants' motion for summary judgment, plaintiffs indicate that they do not contest defendants' motion as to plaintiffs' claim for fraud and intentional misrepresentation. The court will therefore grant defendants' motion for summary judgment on Count VI without further discussion.

**4.** Defendants have filed a counterclaim against both plaintiffs for breach of contract, alleging that both plaintiffs engaged in certain activities after their termination that violated the employment agreement between the parties. Because this counterclaim is not implicated by the motion for summary judgment now before the court, nothing more need be said about defendants' counterclaim at this time.

242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only when its resolution affects the outcome of the case. *Id.* at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252, 106 S.Ct. 2505. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505.

On a motion for summary judgment, the court views the evidence in favor of the non-moving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. With this standard at hand, the court turns to defendants' motion.

## A. Defamation

In Count I of the Complaint, plaintiffs allege that after their termination American Family, through their agents, "made and issued public statements and published to others false and defamatory reasons for Plaintiffs' termination." Complaint (Docket No. 1) at ¶ 38. Plaintiffs contend that American Family pronounced to the public through letters submitted to newspapers and other statements designed for media coverage and to other American Family agents through

electronic mail that plaintiffs were "liars, disloyal and untrustworthy." *Id.* at ¶ 39.

The Complaint specifically refers to four allegedly defamatory statements, and plaintiffs' response to the extant summary judgment motion raises a number of others. The first two statements mentioned in the Complaint were contained in a press release issued by American Family on August 8, 1996, in response to allegations made by the Minnesota Department of Commerce that American Family improperly terminated plaintiffs' contracts.[5] This same release was sent via electronic mail to other American Family agents in Minnesota. The statement, with the alleged defamation underlined, reads:

American Family strongly denies the allegations of the Minnesota Department of Commerce that the company improperly terminated the contacts of two former independent contractor agents. The company believes that the Department's publication of baseless charges against American Family constitutes an abuse of its regulatory authority in the state.

In January 1996 American Family notified Gary Kemp and Mary McClure that their contracts with the company were being terminated. The two agents were engaged in a pattern of disruptive and disloyal activity over a period of years that resulted in the not unexpected termination of their association with American Family.

American Family vigorously objects to the efforts of the Commerce Department to interfere in a private contractual matter between the company and two former independent contractor agents. The Commerce Department and the State Attorney General worked hand in hand with a dissident agents' association lobbyist to influence the Minnesota Legislature to pass a retroactive and unconstitutional law solely for the purpose of prosecuting American Family.

The lawful terminations of agents based on conduct totally unacceptable by any busi-

---

**5.** Plaintiffs allege in the complaint that this statement was quoted in the Minneapolis *Star Tribune,* Saint Paul *Pioneer Press,* Omaha *World Herald,* Wisconsin *State Journal,* and South–West

*Review.* The court is unable to confirm this fact, however, because the record does not contain copies of any articles from these papers that allegedly contain the quotation.

ness standard should not be publicized and sensationalized by a regulatory agency in an effort to make headlines. American Family is confident that the company will prevail in the administrative proceeding commenced by the Department of Commerce, and will strenuously pursue its rights to a full and impartial hearing in this case.

American Family is the 11th largest property casualty insurer in the United States. It has 485 independent contractor agents in Minnesota and employs nearly 900 people in the state.

Exhibit 14 to Affidavit of Harvey Eckart (Docket No. 21) (press release); Exhibit 15 to Affidavit of Harvey Eckart (Docket No. 21) (e-mail).

The third and fourth allegedly defamatory statements mentioned in the Complaint appear in a letter written by Gary Hammer, a Minnesota State Director of American Family, to the Mankato *Free Press*, which was published by that paper on February 19, 1996.[6] Because the context in which these statements appear is relevant, the court will reproduce the full body of Hammer's letter, with the allegedly defamatory statements underlined:

> Last week, *The Free Press* carried a story about a former American Family agent who was fired for violating her contract. The article was biased and incomplete, and I want to more clearly state the company's position.
>
> The headline said, "Insurance agent fired for talking to legislators." The agent, Mary McClure, did more than talk to legislators. She and another agent retained a paid lobbyist at the state capitol to pass legislation that would harm the company and its policyholders. By doing so, she violated her contract, which prohibited her from acting against the best interests of the company.
>
> The legislation favored by McClure would have given her and other agents the right to refuse to sell certain types or amounts of American Family products. We don't like the idea because we feel we have a right to require our sales agents to offer our full line of products. We think consumers ought to have the opportunity to purchase life insurance, for example, and we don't think an agent should have the right to refuse to sell a particular kind of insurance.
>
> The agents involved are falsely claiming they initiated the legislation because they were fighting sales "quotas" that forced them to sell unnecessary insurance products to consumers. This is not true. *The Free Press* accepted the baseless quotas claim without trying to check its accuracy. We insist that our agents act responsibly and ethically, and we do not ask them to sell products if a particular customer does not need them.
>
> We do set sales goals, mutually agreed upon between the agent and sales manager. These sales goals are common in many businesses because the salesperson then knows what is expected, and the company has a measure of performance. But the goals are not mandatory quotas that must be filled for the agents to continue with the company.
>
> The terminated agents are claiming that we are interfering with their "rights" to be involved in the political process. The First Amendment to the U.S. Constitution prohibits unreasonable government restriction on freedom of expression.
>
> Our agents are free to oppose our company's and our policyholders' interests in the legislature, but we are not obligated to reward them financially while they fight us. When they sign contracts, they agree they will not oppose the company's interests. If they break that promise, they break their contract and are terminated. Thankfully, this rarely happens, because most of our agents understand and value the concepts of loyalty and keeping promises.

Exhibit 12 to Affidavit of Harvey Eckart (Docket No. 21).

A number of additional allegedly defamatory statements are raised by plaintiffs in their

---

6. While the letter was written by Hammer, plaintiffs' complaint alleges defamation against only American Family, and not Hammer individually.

response to defendants' summary judgment motion.[7] Plaintiffs point out a letter sent to plaintiffs' former clients in January 1996 which states, in part:

> YOU MAY BE RECEIVING A POLICY WITH ANOTHER COMPANY FROM YOUR FORMER AGENT. YOU DO NOT HAVE TO ACCEPT OR PAY FOR THAT POLICY. WE HOPE YOU WILL REMAIN AN AMERICAN FAMILY INSURED AS WE CERTAINLY APPRECIATE YOUR BUSINESS.

Exhibit 16 to Affidavit of Harvey Eckart (Docket No. 21) at 13 (capitals in original). Plaintiffs also contend that additional statements in Gary Hammer's letter to the Mankato *Free Press* were defamatory, such as the statements that: (1) by retaining a lobbyist McClure "violated her contract, which prohibited her from acting against the best interests of the company"; and (2) "We think consumers ought to have the opportunity to purchase life insurance ... and we don't think an agent should have the right to refuse to sell a particular kind of insurance." *See* Exhibit 12 to Affidavit of Harvey Eckart (Docket No. 21) (full text quoted above). Finally, plaintiffs point to an electronic mail sent from David Krueger[8] to American Family agents in Minnesota on February 8, 1996, stating that by retaining a lobbyist plaintiffs "were in direct violation of the agreements they made in the contracts, and directly against the best interests of the insurance-buying public" and that the terminations were "a matter of simple common sense." Exhibit 13 to Affidavit of Harvey Eckart (Docket No. 21). In analyzing plaintiffs' defamation claim, the court will first set forth the relevant law governing defamation and qualified privilege, and will then analyze each of the forementioned statements in light of this law.

■ In Minnesota, the elements of a common law defamation claim are well settled. In order for a statement to be actionable, the plaintiff must " 'prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation and to lower him in the estimation of the community.' " *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn.1996) (quoting *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 410 (Minn.1994)). *See also Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980).

The first element of plaintiff's prima facie case is falsity of the statement at issue. With regard to this element, the First Amendment provides a limited protection to defamation defendants. While "[u]nder the First Amendment there is no such thing as a false idea[,] ... there is no constitutional value in false statements of fact." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In evaluating the scope of First Amendment protection, the Supreme Court has rejected the "artificial dichotomy between 'opinion' and fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). As the Court observed in *Milkovich*, "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* at 18, 110 S.Ct. 2695.

■ To distinguish between protected expressions of idea and actionable assertions of fact, Minnesota courts rely on the framework developed in *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir.1986), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). *See Hunt v. University of Minnesota*, 465 N.W.2d 88, 93–94 (Minn.Ct.

---

7. The four statements listed in the Complaint are noted as being "[b]y way of example and not in limitation thereof." Complaint (Docket No. 1) at ¶ 39. The court notes that under Minnesota law, a claim for defamation " 'must be pled with a certain degree of particularity.' " *French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 883 (D.Minn.1997) (quoting *Schiburský v. International Business Machines Corp.*, 820 F.Supp. 1169, 1181 (D.Minn.1993)). While it is not necessary for the Complaint to recite the exact language spoken, plaintiffs must identify who made the defamatory statement and what was said.

*Schibursky*, 820 F.Supp. at 1181. By omitting certain statements in the Complaint and raising them only in their response to defendants' summary judgment motion, plaintiffs violate this rule. While this is an independent reason to find these statements nonactionable, the court will discuss in the body of this Order additional reasons why summary judgment is appropriate.

8. While Krueger is named as an individual defendant in this case, only the American Family defendants, and not Krueger in his individual capacity, are named in the defamation count.

App.1991); *Lund v. Chicago and Northwestern Transp. Co.*, 467 N.W.2d 366, 369 (Minn. Ct.App.1991). Under *Janklow*, courts evaluate whether a statement has defamatory meaning using four factors: (1) the statement's precision and specificity; (2) the statement's verifiability; (3) the social and literary context in which the statement is made; and (4) the statement's public context. *Janklow*, 788 F.2d at 1302–03. *See also Geraci v. Eckankar*, 526 N.W.2d 391, 397 (Minn. Ct.App.1995), *rev. denied*, March 14, 1995, *cert. denied*, 516 U.S. 818, 116 S.Ct. 75, 133 L.Ed.2d 34 (1995). These factors are "considered together" and "the decision whether a statement is fact or opinion must be based on all the circumstances involved." *Janklow*, 788 F.2d at 1302. Whether a statement can be interpreted as stating facts or can be proven false is a question of law. *McGrath v. TCF Bank Sav. FSB*, 502 N.W.2d 801, 808 (Minn.Ct.App.1993).

■ The first *Janklow* factor, precision and specificity, addresses how susceptible a statement is to being understood as a factual assertion. "It is difficult to call a vague or imprecise statement a fact." *Janklow*, 788 F.2d at 1302. The second factor, verifiability, goes directly to whether a statement may be considered a "fact." Statements may be "phrased so that it is hard to establish a provable proposition," or the subject matter of the statement "may intrinsically be unsuited to any sort of quantification." *Id.* In addressing the issue of ambiguous subject matter, Minnesota courts have recently employed the doctrine of "substantial truth." *See Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn.Ct.App.1996), *rev. denied*, June 19, 1996; *Anjoorian v. Minneapolis Dep't of Public Safety*, 1997 WL 527233 (Minn.Ct. App. Aug.26, 1997), *rev. denied*, Oct. 21, 1997 (unpublished). Under this doctrine,

> A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances.

*Hunter*, 545 N.W.2d at 707. The third Janklow factor addresses the immediate contextual factors that may affect the recipient of a disputed statement. The publisher of a statement will often use tone or cautionary language to diminish or negate the overall defamatory effect. *See Janklow*, 788 F.2d at 1302. Further, the "category of publication, its style of writing and intended audience" may influence how a statement is understood. *Id.* at 1303. The fourth and final *Janklow* factor considers the broader public context in which a statement is made. "[W]hen determining initially whether a statement is fact or opinion, it does a disservice to the First Amendment not to consider the public or political arena in which the statement is made and whether the statement implicates core values of the First Amendment." *Id.* at 1303.

■ The third element[9] of plaintiffs' prima facie case is damage to their reputation. Because there are two types of statements involved in this case, those published in the media and those not communicated through private channels, two different rules are applicable. As for statements transmitted through the media, the Minnesota Supreme Court held in *Richie* that:

> absent allegations of actual malice, in order to survive a summary judgment motion in a defamation action concerning statements made by the media and involving a matter of public concern, there must be a genuine issue of material fact as to whether [the plaintiff] suffered actual harm; damages cannot be presumed.

544 N.W.2d at 26. Private defendants utilizing the media are subject to the same rule. *Id.* at fn. 5. To prove actual malice, a defamation plaintiff must show by clear and convincing evidence that the defendant made defamatory statements either knowing the statements were false or acting recklessly with regard to whether the statements were true. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). A plaintiff is entitled to prove actual malice by circumstantial evidence. *See Harte–Hanks Communications, Inc. v.*

9. There is ample evidence that the statements at issue were communicated to parties other than plaintiffs, thereby satisfying the communication requirement.

*Connaughton,* 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). The question of whether the evidence in the record in a defamation case can support a finding of actual malice is a question for the court. *Id.* at 687, 109 S.Ct. 2678. Although actual malice "focus[es] on the defendant's attitude toward the truth of what he has said rather than on his attitude toward the plaintiff," *Stuempges,* 297 N.W.2d at 258, a showing of ill will "is nevertheless relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity." *Cochran v. Indianapolis Newspapers, Inc.,* 175 Ind.App. 548, 372 N.E.2d 1211, 1220 (Ind.Ct.App.1978).

■ For those statements communicated by American Family through nonpublic fora such as letters and electronic mail, a different damages rule applies. In that situation, slander affecting a person in his or her business, trade, profession, office or calling is slanderous per se and actionable without any proof of damages. *Stuempges,* 297 N.W.2d at 255.

■ Even if plaintiffs are able to satisfy their prima case as to any of the statements, summary judgment in favor of American Family is still warranted if a qualified privilege applies. For a defamatory statement to fall within the sphere of qualified privilege the statement "must be made upon a proper occasion, from a proper motive, and must be based on reasonable or probable cause." *Stuempges,* 297 N.W.2d at 256–57 (citation omitted). However, if the plaintiff proves the defamatory statement was made with malice, the privilege will not apply. *See id.* In this context, to show defendant acted with malice plaintiffs must show "actual ill-will or a design causelessly and wantonly to injure plaintiff." *Bol v. Cole,* 561 N.W.2d 143, 149 (Minn.1997). Malice can be proven by extrinsic evidence or by intrinsic evidence, which may include "the exaggerated language of the libel, the character of the language used, the mode and extent of publication." *Frankson v. Design Space Intern.,* 394 N.W.2d 140, 144 (Minn.1986). Whether a qualified privilege exists is a question of law for the court. *See Lewis v. Equitable Life Assur. Soc. of the U.S.,* 389 N.W.2d 876, 889 (Minn.1986). With these standards in

hand, the court now turns to the allegedly defamatory statements in this case.

**1. Press release dated August 8, 1996**

■ The two allegedly defamatory statements contained in the August 8, 1996, press release are the averments· that "the two agents were engaged in a pattern of disruptive and disloyal activity over a period of years" and that the terminations were based on "conduct totally unacceptable by any business standard." As an initial matter, the court finds that under the *Janklow* factors these statements are protected expressions of idea rather than actionable assertions of false fact. Both of these statements are imprecise and lack specificity. *See, e.g., McGrath,* 502 N.W.2d at 808 (holding that the phrase "troublemaker" is not defamatory because, among other things, it lacks precision and specificity). In addition, both statements are unsuited to quantification and therefore not easily verifiable. It is not easy to establish what qualifies as a "pattern of disruptive and disloyal activity" or as "conduct totally unacceptable by any business standard." Different people will have different conceptions of what falls within these categories. The context in which these statements were made also mitigates against any defamatory meaning the recipient of these statements might infer. American Family was responding to allegations made by the Minnesota Department of Commerce that American Family improperly terminated plaintiffs' contracts. A reasonable person who read these statements would consider them to be American Family's defense to the charges. The press release, couched in terms of a denial of the findings of the Department of Commerce and objection to that agency's interference, was not inflammatory. Finally, the press release was part of the public discourse surrounding the termination of plaintiffs. American Family's proffered basis for the terminations should be considered part of the debate surrounding the company's actions. For these reasons, the court finds the statements contained in the press release to be protected expression and not defamatory.

■ In addition, because the statements involve a private actor utilizing the media, plaintiffs have not proffered sufficient evidence of either actual malice or, in lieu of actual malice, actual harm to satisfy their burden with respect to damages. As to actual malice, plaintiffs have not proffered evidence that American Family made the statements contained in the press release with knowledge that the statements were false or with reckless disregard to the statements' truth or falsity. *See New York Times,* 376 U.S. at 280, 84 S.Ct. 710. Indeed, the evidence before the court establishes that American Family did indeed believe that plaintiffs had engaged in disruptive and disloyal activity and that this activity was unacceptable by any business standard. Plaintiffs also have failed to proffer evidence of actual harm. Before the court are affidavits of Carrie Kemp (Docket No. 18), Gary Kemp (Docket No. 19), and Mary McClure (Docket No. 20), in which the declarants state that others have approached them to inquire into the reasons for plaintiffs' termination and what plaintiffs did wrong. The Minnesota Supreme Court, however, has held that this is insufficient evidence of actual harm. *Richie,* 544 N.W.2d at 26 (holding that damages cannot be presumed and deeming inquiries from friends and family and inchoate feelings of being snubbed insufficient to prove actual harm).

Even if plaintiffs could satisfy their prima facie case, the court finds that American Family's statements in the press release were privileged. As the court has already mentioned, the statements were made in direct response to a finding by the Minnesota Department of Commerce that plaintiffs' terminations were improper. In making the statements, American Family was defending itself against the charges in the forum of public opinion. Given plaintiffs' actions and American Family's perception that those actions were inimical to the insurer's interests, the statements were based on reasonable cause. While a qualified privilege does not apply if plaintiffs demonstrate "actual ill-will or a design causelessly and wantonly to injure," *Bol,* 561 N.W.2d at 149, no such showing has been made. Plaintiffs speculate and make broad accusations that a conspiracy existed among American Family's highest executives to emasculate the Association; however, the evidence before the court demonstrates that only David Krueger, the regional vice-president whose duties included agent terminations, made the decision to terminate plaintiffs. There is no record evidence of any ill-will toward plaintiffs, only innuendo, which is insufficient to overcome the qualified privilege the court finds to be applicable. *See Harvet v. Unity Medical Center, Inc.,* 428 N.W.2d 574, 579 (Minn.Ct.App.1988) ("In the present case allegations made by appellant in support of her claim of malice are based on conjecture and speculation and are insufficient to create a jury question.").

**2. Electronic mail dated August 8, 1996**

Because the electronic mail dated August 8, 1996, contained the verbatim text of the press release, much of the court's analysis with regard to the two allegedly defamatory statements contained in the press release is equally applicable here. The court finds the statements to still be protected expressions of idea rather than actionable assertions of false fact. Nothing has changed regarding their imprecision, lack of specificity, and unverifiability. In this instance the statements were transmitted via electronic mail to other American Family agents in Minnesota. While American Family distributed the press release to defend itself before the public, the electronic mail was designed to distribute the company's answer to the charges directly to the company's agents. For the same reasons as previously stated, the statements in the electronic mail are also protected expression.

Even assuming plaintiffs could satisfy their prima facie case,[10] the court finds the statements made in the press release to also be privileged. For the reasons outlined above, the court finds the motive of American Family in making the statements and the occasion on which they were made proper, and that the statements were made with probable

---

**10.** The court assumes for purposes of this allegedly defamatory statement that plaintiffs could demonstrate that the statements were communicated and that they somehow affected plaintiffs in their business, trade, profession, or calling, thereby eliminating the requirement of proof of damages.

cause. The fact that the language of the press release was not altered before being sent to other agents defeats any argument of malice. American Family could have, but did not, exaggerate the language used in the press release or make more egregious allegations before sending the electronic mail in an attempt to intimidate other agents.

### 3. Hammer letter

The court next turns to the allegedly defamatory statements contained in Gary Hammer's letter to the Mankato *Free Press*. As an initial matter, the court notes that the letter appears under the bold caption "Opinions." *See* Exhibit 12 to Affidavit of Harvey Eckart (Docket No. 21). It is in this context the statements must be analyzed.

The first statement in question is Hammer's assertion that by retaining a lobbyist, plaintiff McClure "violated her contract, which prohibited her from acting against the best interests of the company." While it certainly is American Family's position that this is a true statement, even if plaintiff McClure [11] could show this statement was false she has failed to show any damages. Because this statement involves a private defendant utilizing the media, plaintiff must demonstrate actual malice or actual damages. The company's position is that plaintiff McClure did violate her contract in hiring a lobbyist; therefore, she cannot be heard to claim that American Family knew this statement was false when made or acted recklessly with regard to whether the statement was true. Further, as detailed above, plaintiff has failed to show actual damages. She therefore cannot satisfy her prima facie case of defamation as to this statement.

In the second statement at issue, Hammer states that "[w]e think consumers ought to have the opportunity to purchase life insurance, for example, and we don't think an agent should have the right to refuse to sell a particular kind of insurance." While plaintiffs claim this statement is false because it ignores the Minnesota statutory provision that imposes a duty on insurance agents to sell only suitable products, the court finds this statement to be a nonactionable opinion.

An insurance agent's duty to sell only suitable products is separate from the issue of his or her right to refuse to sell a particular product. This statement is nonactionable.

The third statement at issue declares that "[t]he agents involved are falsely claiming they initiated the legislation because they were fighting sales 'quotas' that forced them to sell unnecessary insurance products to consumers." It is American Family's opinion that plaintiffs pushed for the Quota Bill to avoid having to sell certain types of insurance, not because they were being forced to sell unnecessary insurance products. Hammer was certainly entitled to state American Family's position, and while on the surface the statement would appear to be one of fact, in essence it is really the company's opinion of why plaintiffs were so interested in the Quota Bill.

The final allegedly defamatory statement is Hammer's conclusion that "most of our agents value the concepts of loyalty and keeping promises." While it is certainly hoped that this statement is true, it is clearly an opinion that is not precise or verifiable. Even if plaintiffs argue that the negative implication of this statement is that McClure and Kemp do not value loyalty and keeping promises, the substantial truth doctrine applies in this instance because a nondefamatory interpretation of this statement exists.

■ While the court finds that plaintiffs have failed to satisfy their prima facie case as to any of these statements, summary judgment is also appropriate because a qualified privilege again applies. Hammer's letter explicitly states that it is written in response to a story carried in the paper a week earlier that was "biased and incomplete." The purpose of the letter was to "more clearly state the company's position." Hammer, without exaggerated or inflammatory language, succinctly states American Family's position on the terminations. Because there is a qualified privilege in this case, and plaintiffs fail to show any malice on the part of Hammer or American Family in responding to the article, the statements are nonactionable.

---

11. Because this statement refers only to plaintiff McClure, it would appear that, unlike the other statements, only she has an actionable claim arising from the Hammer letter.

#### 4. Letter to plaintiffs' former clients dated February 8, 1996

■ Plaintiffs allege that the statement in the January 1996 letter sent by American Family to their former clients, informing the clients that they may be receiving a policy with another insurance company from plaintiffs and that they do not have to accept or pay for that policy, is defamatory. The court, however, again disagrees.

Plaintiffs in this instance are unable to show that this statement is not true. The former clients may indeed have received a policy with another company, and they did not in fact have to pay for that policy. Because truth is a complete defense, this statement is not actionable. *See Stuempges*, 297 N.W.2d at 255 ("Truth ... is a complete defense, and true statements, however disparaging, are not actionable."). While plaintiffs claim that the statement "you do not have to pay for that policy" implies there is something wrong with dealing with them and purposefully implies that plaintiffs are dishonest or engaged in some illegal acts, the court points to the forementioned "substantial truth" doctrine. Even if plaintiffs' interpretation were feasible, because a nondefamatory interpretation of this statement exists, no threshold showing of falsity is possible. Further, because the statements in question do not even mention plaintiffs by name, the court is not convinced that such statements could be considered slander per se and consequently be actionable without proof of damages, which plaintiffs have failed to proffer.

■ The court also again finds that American Family enjoyed a qualified privilege in making the statement in its letter to policyholders. Assuming plaintiffs were trying to entice former clients who were American Family policyholders to pay for a policy with another carrier, American Family was not acting unreasonably in informing its policyholders that they did not have to change carriers simply because their former Ameri-can Family agent was now selling a different company's policies. The court again finds that no malice is evident, as American Family, if it had desired to wantonly injure plaintiffs, could have made allegations against them in the letter. Instead, no discussion of the controversy surrounding the terminations is even alluded to.

#### 5. Electronic mail dated February 8, 1996

■ Finally, plaintiffs allege that statements by David Krueger in an electronic mail sent to American Family agents in Minnesota that by retaining a lobbyist plaintiffs "were in direct violation of the agreements they made in the contracts, and directly against the best interests of the insurance-buying public" and that the terminations were "a matter of simple common sense" were defamatory. The court, however, once again finds that American Family was privileged in making the statements.[12]

The electronic mail in question begins with the statement:

THE MINNEAPOLIS STAR TRIBUNE PUBLISHED A STORY TODAY (FEB. 8, 1996) RELATING TO THE RECENT CONTRACT CANCELLATIONS OF TWO FORMER AMERICAN FAMILY AGENTS. WHILE THE STAR TRIBUNE ARTICLE DID PROVIDE INFORMATION REGARDING THE COMPANY'S POSITION ON THIS ISSUE, THIS MESSAGE WILL ALSO PROVIDE YOU WITH A COMPLETE COPY OF THE COMPANY'S FORMAL POSITION STATEMENT ON THE MATTER.

Exhibit 13 to Affidavit of Harvey Eckart (Docket No. 21) (capitals in original). This statement shows that the electronic mail was designed to provide American Family agents with a more complete explanation of the company's position on the reasons behind the terminations. Given the press coverage of the matter, the statements contained in the

---

12. By discussing at length only the privilege finding, the court does not mean to imply that plaintiffs have satisfied their prima facie defamation case as to these statements. Only the statement that plaintiffs "were in direct violation of the agreements they made in the contracts" is capable of being proven false. Saying that plaintiffs' actions were "directly against the best interests of the insurance-buying public" and that the terminations were "a matter of simple common sense" lacks precision and is not easily verifiable. The context in which all three statements were made also persuades the court that these statements are not defamatory.

electronic mail were certainly made on a proper occasion and from a proper motive. American Family believed that plaintiffs' actions in hiring a lobbyist were in direct violation of their agency agreements, that the Quota Bill was against the public interest, and, as a result, the terminations were logical. The court therefore finds that the statements were made on reasonable cause. Because once again plaintiffs have failed to show malice, a qualified privilege applies.

Based on the foregoing discussion, the court finds that summary judgment in favor of defendants on Count I of the Complaint is warranted, and plaintiffs' claims for defamation should be dismissed.

## B. Wrongful Termination in Violation of Public Policy

In Count II of the Complaint, plaintiffs allege they were wrongfully terminated in violation of public policy by the American Family defendants "solely because they contacted the Minnesota Legislature concerning the suitability of certain insurance products for consumers, including products for their clients." Complaint (Docket No. 1) at ¶ 42. Plaintiffs' allegations rely on perceived protections provided by the Minnesota and United States Constitutions and Minn.Stat. § 72A.20 Subd. 20.

Defendants' memorandum in support of their summary judgment motion spends considerable space discussing the applicability of Minn.Stat. § 72A.20 Subd. 20 to plaintiffs' actions in this case. At the time of the actions giving rise to this litigation, that provision provided that "[a]n insurance company may not terminate or otherwise penalize an insurance agent solely because the agent contacted any government department or agency regarding a problem that the agent or an insured may be having with an insurance

company." Defendants cite to convincing evidence that at the relevant time § 72A.20 Subd. 20 protected only contacts with an executive department or agency, not the legislature. Defendants point to the plain language of this provision, legislative history, the bill's title, and the language in other laws concerning the same subject for the proposition that plaintiffs' actions in hiring a legislative lobbyist or having contact with the legislature themselves was not protected activity, as such actions did not involve contact with an executive department or agency. See Defs.' Mem. in Supp. of Summ. J. (Docket No. 15) at 10–14. Plaintiffs do not rebut any of this evidence, instead contending that they do not rely on a violation of § 72A.20, but merely cite the alleged violation of the statute in support of their argument that they were terminated in violation of public policy.

The court finds, based on the evidence provided by defendants, that American Family did not violate § 72A.20 in terminating plaintiffs. This is in accordance with the findings of the Administrative Law Judge who considered this issue in a prior administrative proceeding brought by the Minnesota Department of Commerce.[13] See Findings of Fact, Conclusions of Law and Recommendation, Exhibit 19 to Affidavit of David Jendrzejek (Docket No. 22) at 22, 29–32. This finding is buttressed by the fact that in 1996, after plaintiffs' termination and arguably in response to it, the Minnesota Legislature amended § 72A.20 Subd. 20 to protect contact between insurance agents and the legislature.[14]

Plaintiffs argue that their public policy claim goes beyond any violation of § 72A.20, contending that defendants terminated plaintiffs because they "engaged in constitutionally protected free speech and ... constitu-

---

13. The parties disagree whether collateral estoppel applies to bar the court from reconsidering the applicability of Minn.Stat. § 72A.20 Subd. 20. Defendants contend that this issue has already been litigated adversely to plaintiffs' position as a result of the administrative proceeding. Due to the flexibility and imprecise nature of the collateral estoppel doctrine, however, the court, without finding that collateral estoppel does not apply, has considered anew the applicability of § 72A.20.

14. Minn.Stat. § 72A.20 Subd. 20 now reads:
   **Contact with government.** An insurance company may not terminate or otherwise penalize an insurance agent solely because the agent contacted any government department or agency regarding a problem that the agent or an insured may be having with an insurance company. For purposes of this section, "government department or agency" includes the executive, legislative, and judicial branches of government as stated in Article III of the Constitution.

tionally protected freedom of association, in circumstances which Plaintiffs had no reason to believe violated any contractual provisions." Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. (Docket No. 16) at 29. However, plaintiffs overlook the fact that Minnesota has not recognized a cause of action for the type of activity that occurred in this case.

■ Minnesota law does protect whistleblowing activity. Minn.Stat. § 181.932 provides that "[a]n employer shall not discharge ... an employee ... because the employee ... in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." However, as is clear from the plain language of the statute, § 181.932 protects only employees. *See* Minn.Stat. § 181.931 Subd. 2 (" 'Employee' means a person who performs services for hire in Minnesota for an employer. Employee does not include an independent contractor."). Plaintiffs' contracts specifically provide that they are not employees of American Family for any purposes, but instead are independent contractors. *See* Exhibit 3 to Affidavit of Harvey Eckart (Docket No. 21) at P 182 (Kemp contract); Exhibit 4 to Affidavit of Harvey Eckart (Docket No. 21) at P 119 (McClure contract). The protections provided by § 181.932 are therefore not available to plaintiffs. *See Werner v. New Balance Athletic Shoe, Inc.,* 824 F.Supp. 890, 893 (D.Minn.1993) (holding that Minn.Stat. § 181.932 is inapplicable where plaintiff was an independent contractor).

■ Even if plaintiffs were somehow covered by the whistleblower statute, they have failed to satisfy their prima facie case of retaliation. To state a prima facie case, plaintiffs must establish: (1) they engaged in conduct protected under the act; (2) adverse employment action by the employer; and (3) a causal connection between the two. *Hubbard v. United Press Intern., Inc.,* 330 N.W.2d 428, 444 (Minn.1983). Here, plaintiffs have failed to show that they engaged in conduct protected by the act. While they claim that lobbying in favor of the Quota Bill is protected activity, plaintiffs have not pointed to any illegality in American Family's requirement that they sell all lines of the company's insurance. Plaintiffs do have a

duty to sell only that insurance which is appropriate for a particular client; however, nothing about the requirement that they sell all lines of insurance violates this duty. Plaintiffs' lobbying efforts were not aimed at reporting any activity that they felt was illegal, but instead was aimed at changing the internal policies of American Family. This type of activity is not protected. *See, e.g., Nichols v. Metropolitan Center for Indep. Living,* 50 F.3d 514, 517 (8th Cir.1995) (holding that challenge to management policies not actionable); *Vonch v. Carlson Companies, Inc.,* 439 N.W.2d 406, 408 (finding that internal company disputes are not within the domain of the public interest). While plaintiffs profess their right to free speech and association, the court agrees with defendants that exercising one's rights as a citizen to speak out on a matter of public concern is not whistleblowing. Because in this case plaintiffs were not reporting a violation of law, American Family did not terminate them in violation of public policy.

## C. Tortious Interference with Contract

Plaintiffs allege in Count III of the Complaint that defendants DeSalvo, Krueger, Pierce, and Mathwich committed tortious interference with contract. In the Complaint, plaintiffs contend that when the Association raised concerns about the decision of American Family to reduce agent commissions while concomitantly increasing the salary and benefits of DeSalvo, Krueger, Pierce, and Mathwich, these defendants,

> acting for their own personal benefit and in derogation of the rights and benefit of American Family Mutual Insurance Company, American Standard Insurance Company of Wisconsin, and American Family Life Insurance Company, intentionally and maliciously interfered with, and terminated, the agency contracts between Defendant Companies and Kemp and between Defendant Companies and McClure.

Complaint (Docket No. 1) at ¶ 48.

■ It is well-established under Minnesota law "that a third party who interferes with and causes the breach of a contract may be held liable for damages". *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361

(Minn.1998). A cause of action for tortious interference with a contractual relationship requires proof of the following five elements: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. *H Enterprises Intern., Inc. v. General Elec. Capital Corp.*, 833 F.Supp. 1405, 1419 (D.Minn.1993); *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn.1994); *Furlev Sales and Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982).

■ The general rule is that a party cannot interfere with its own contract. *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505 (Minn.1991); *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900–01 (Minn.1982). The reason for this rule is that "[i]f a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort." *Nordling*, 478 N.W.2d at 505. A corporate officer may be liable for tortious interference with contract only if he or she acts outside the scope of his or her duties. *French v. Eagle Nursing Home, Inc.*, 973 F.Supp. 870, 883 (D.Minn. 1997); *Nordling*, 478 N.W.2d at 506. An important factor in determining if a corporate officer has acted outside the scope of his or her duties is the presence of malice or bad faith, ill-will, spite, hostility, or a deliberate intent to harm the plaintiff. *Id.* at 507; *Bouten*, 321 N.W.2d at 901 (finding no question of fact for jury where plaintiff produced no evidence that an individual defendant "acted outside the scope of the best interest of the corporation or with malice for his own personal interest").

■ Plaintiffs contend that ample evidence exists in the record that defendants DeSalvo, Krueger, Pierce, and Mathwich acted with malice in terminating their contracts. Plaintiffs allege that: (1) Mathwich and Pierce, as board members, had a personal interest in quelling a proxy battle allegedly orchestrated by the Association to preserve their board seats; (2) there was ill-will between the individual defendants, as high·

ranking officials of American Family who were enjoying rising salaries and benefits, and American Family agents, who were subject to decreasing commissions and sales quotas; and (3) defendant Krueger could not have acted unilaterally, and was in fact acting at the behest of others.

First, plaintiffs contend that ill-will and malice is manifest in the decision to terminate them because defendants Mathwich and Pierce wished to foreclose any proxy fight that might result in the loss of their seats on the board. The only record evidence plaintiffs point to in support of this allegation is a December 27, 1995, memorandum from defendant Mathwich to the American Family Board of Directors stating:

> On December 21 we learned that at least one dissident agent had enlisted the aid of an attorney in soliciting proxies hostile to the management of American Family with the goal of electing a slate of directors at the annual policyholders meeting on March 5, 1996. These individuals are encouraging agents to solicit proxies from their insureds in support of their goals.
>
> Within the first 24 hours we accomplished two things. We first communicated to all agents through their regional vice presidents that these dissident efforts were going on, that management viewed these efforts as contrary to the company's best interests, and that we needed and valued agents support and loyalty.
>
> Second, we terminated the contract of the dissident agent we knew was involved in these efforts.
>
> We followed up by letting employees know about the situation and requesting their support. In addition we requested that agents support the company by soliciting proxies for current management and provided them with the forms and information to do so.

Exhibit 11 to Affidavit of Harvey H. Eckart (Docket No. 21). Plaintiffs argue that this memorandum shows an intent to terminate any agent encouraging a proxy fight.

The court, however, disagrees. The Eighth Circuit has held that a plaintiff may not rely on "unreasonable inferences and speculation to establish the necessary evi-

dentiary basis required to support a finding that [defendant] intentionally interfered" with a plaintiff's contract. *Sip–Top, Inc. v. Ekco Group, Inc.,* 86 F.3d 827, 832 (8th Cir.1996). As is clear from its face, the memorandum involves another agent in a separate matter occurring over a year before plaintiffs' termination. There is no evidence in the record that a proxy fight influenced the decision to terminate plaintiffs.[15] Indeed, the deposition testimony of defendants Mathwich and Pierce indicate that they played no role in plaintiffs' termination and learned of Krueger's decision to terminate plaintiffs only after the decision had been made. *See* Deposition of Harvey Pierce, Exhibit 8 to Affidavit of David Jendrzejek (Docket No. 22) at 10–12. Deposition of Dale Mathwich, Exhibit 9 to Affidavit of David Jendrzejek (Docket No. 22) at 17–18. The evidence that Mathwich and Pierce did not participate in the termination of plaintiffs' contracts is rebutted only by rank speculation.[16] Therefore, because plaintiffs have failed to show that Mathwich and Pierce procured the breach of their contracts, summary judgment is appropriate as to those two defendants. *See United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 632 (Minn.1982) ("In an action for tortious interference with contractual relations, the plaintiff carries the burden of proving that interference was caused by the defendant.") (citations omitted).

The deposition testimony of defendant DeSalvo also demonstrates that he learned of the decision to terminate plaintiffs after-the-fact. He expressly denied having a hand in the termination of either plaintiff, and indicated that Krueger, as the regional vice-president, made the decision. Deposition of Daniel DeSalvo, Exhibit 7 to Affidavit of David Jendrzejek (Docket No. 22) at 4. While he did learn of the decision to terminate the contracts before January 11, 1996, when Krueger called to inform him of the action, DeSalvo testified that he did not have any information from any source before that call that the terminations were imminent or were going to happen. *Id.* at 6–7. Thus, plaintiffs have also failed to show, beyond mere allegation, how defendant DeSalvo procured the termination of their contracts, and summary judgment is appropriate as to him as well.

All of the deposition testimony before the court debunks plaintiffs' belief that defendant Krueger could not have acted unilaterally in terminating their contracts, and was in fact acting at the behest of others. There is simply no evidence in the record that Krueger consulted anyone other than the American Family legal department when deciding to terminate plaintiffs, or that anyone other than Krueger made the final decision after reviewing the relevant information. Deposition of David Krueger, Exhibit 6 to Affidavit of David Jendrzejek (Docket No. 22) at 6–7, 12, 41–42. Terminating agents' contracts was specifically part of Krueger's duties. *Id.* at 6 ("In my position I make all of the final decisions in regard to all contracts with American Family at that particular time in the northwest region."). There is more than ample evidence that Krueger terminated plaintiffs for hiring a lobbyist to support the Quota Bill, conduct he deemed "prejudicial to the company," and plaintiffs have failed to demonstrate that in terminating their contracts Krueger was acting outside of his duties due to malice or bad faith. Because there is no evidence that Krueger acted without justification, summary judgment in favor of him on this claim will be granted.

### D. Intentional Interference with Prospective Contractual Relations

Count IV of the Complaint alleges intentional interference with prospective contractual relations against the American Family defendants. Plaintiffs contend that:

> Defendant companies, through its agents, have intentionally engaged in a pattern and practice of declaring to the public, including to persons insured by Kemp and

---

**15.** Plaintiff Kemp's deposition testimony reveals that, while he does not recall whether he told anyone at American Family that he had collected some proxies, he cannot "put a name on anyone" he told. Deposition of Gary Kemp (Docket No. ___) at 221–223.

**16.** Plaintiffs' contention that ill-will between the individual defendants and American family agents, arising as a result of the increasing salary/decreasing commission dichotomy, somehow led to their termination is also not supported by any record evidence, and is nothing more than bare allegation and speculation.

McClure, that for years Kemp and McClure were disloyal and disruptive agents. Defendant companies mailed letters to over 2600 clients of Kemp and McClure that implied Kemp and McClure were untrustworthy and dishonest.

Complaint (Docket No. 1) at ¶ 51. By disseminating "negative and defamatory publicity," plaintiffs argue that "[d]efendant companies have induced or otherwise caused existing and prospective clients of Kemp and McClure to not continue or to not enter into agreements to purchase insurance from Kemp and McClure." *Id.* at ¶ 52.

In defining the tort of intentional interference with prospective contractual relations, Minnesota has adopted the elements set out in the Restatement of Torts:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*United Wild Rice,* 313 N.W.2d at 632–33 (citing Restatement (Second) of Torts § 766B (1979)). *See also Hunt,* 465 N.W.2d at 95 ("To establish a claim of tortious interference with a prospective business relationship, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship.").

To survive summary judgment, plaintiff carries the burden of demonstrating interference with a specific contractual relationship. *See International Travel Arrangers v. NWA, Inc.,* 991 F.2d 1389, 1405 (8th Cir.1993) ("[T]he mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law."), *cert. denied,* 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 309 (1993); *Midwest Great Dane Trailers, Inc. v. Great Dane Ltd. Partnership,* 977 F.Supp. 1386, 1395 (D.Minn.1997) (noting the necessity for evidence of inten-

tional interference with specific business relations); *Sports and Travel Marketing, Inc. v. Chicago Cutlery Co.,* 811 F.Supp. 1372, 1382 (D.Minn.1993) ("Without evidence that a defendant's wrongful conduct influenced a prospective customer's decision to enter into a contract, summary judgment is appropriate.").

Plaintiffs argue that there are issues of material fact as to whether defendant intentionally interfered with their prospective contractual relations. They point specifically to the letter sent to plaintiffs' former clients that allegedly implied that they were untrustworthy and dishonest. Plaintiffs contend that this letter, when considered with other statements made by American Family and the public nature of their terminations, gives rise to an actionable claim.

■ Summary judgment in favor of defendants must be granted on this claim because plaintiffs have failed to come forward with evidence of any specific prospective contractual relationship that was interfered with by defendants' actions. There is no evidence in the record of any specific prospective contractual relationship that was disrupted; indeed, the only argument plaintiffs can muster in support of this claim is that "[d]efendants induced or otherwise caused existing and prospective third party clients of Plaintiffs to not continue or to not purchase insurance from Plaintiffs." Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. (Docket No. 16) at 28. Because plaintiffs have failed to point to any specific person who declined to purchase insurance from them as a result of defendants' actions, their claim for intentional interference with prospective contractual relations is insufficient as a matter of law.

### E. Violation of the Uniform Deceptive Trade Practices Act

Count V of the Complaint alleges that the American Family defendants violated Minn. Stat. § 325D.44, the Minnesota Uniform Deceptive Trade Practices Act:

> By engaging in a pattern o[r] practice of negative and defamatory publicity about agents Kemp and McClure, including but not limited to sending letters to all of Kemp's and McClure's clients that state without explanation that Kemp and

McClure no longer represent Defendants and, following these letters, declaring to the press that Kemp and McClure were liars and disloyal and disruptive agents, Defendant companies have disparaged the services and business of Kemp and of McClure by false and misleading representation of fact in violation of Minn.Stat. § 325D.44 Subd. 1(8).

Complaint (Docket No. 1) at ¶ 54. In addition, plaintiffs contend that "[t]he negative publicity campaign targeted at Kemp and at McClure by Defendant Companies has created a likelihood of confusion or misunderstanding about Kemp's and about McClure's professionalism, trustworthiness, and competence to sell insurance to former, current, and prospective clients in violation of Minn. Stat. § 325D.44, Subd. 1(13)." [17]  *Id.* at ¶ 55.

The Minnesota Deceptive Trade Practices Act provides in relevant part that:

Subdivision 1. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn.Stat. § 325D.44, Subd. 1(8) and 1(13). A party alleging a violation of § 325D.44 need not prove competition between the parties or actual confusion or misunderstanding. *See* Minn.Stat. § 325D.44 Subd. 2; *Scott v. Mego Intern., Inc.,* 519 F.Supp. 1118, 1137 (D.Minn.1981). While not having to prove actual confusion or misunderstanding, a party must show there is a likelihood of confusion. *Claybourne v. Imsland,* 414 N.W.2d 449, 451 (Minn.Ct.App.1987).

Plaintiffs' allegations relating to § 325D.44 Subd. 1(8) center on the letter sent by American Family to plaintiffs' former clients and statements made to the press that plaintiffs were disloyal and disruptive agents. As pointed out in *United Wild Rice,* "[a]n action under Minn.Stat. § 325D.44 subd. 1(8) ... to recover for a false or misleading statement or report differs significantly from an action for defamation where there is a presumption that the disparaging statement is false." 313 N.W.2d at 634. The burden is on the plaintiff in this instance to prove that the statements at issue are false. *Id.* at 635. As pointed out previously, the statements contained in the letter sent by American Family to plaintiffs' former policyholders are true on their face, regardless of what plaintiffs wish to read into them. Also, any statements made concerning plaintiffs' relationship with American Family to the effect that plaintiffs were disloyal or disruptive are incapable of being proven true or false because they constitute statements of opinion concerning plaintiffs' actions. In addition, plaintiffs have failed to demonstrate how any of the statements relate to their goods, services, or business. Anything said by American Family concerns only the relationship between the parties in this action.

Plaintiffs have also failed to present sufficient evidence from which a reasonable jury could find in their favor on the alleged violation of Minn.Stat. § 325D.44 Subd. 1(13). While plaintiffs argue that statements made by American Family have created a likelihood of confusion or misunderstanding about their professionalism, trustworthiness, and competence to sell insurance, as already stated these statements relate only to plaintiffs' relationship with American Family. Nothing in any of the statements analyzed above says anything about the quality of insurance plaintiffs sell subsequent to their employment with American Family or the services provided to former, current, or prospective clients.[18] For these reasons, summary judg-

17. The court notes that while the complaint alleges violations of both Subd. 1(8) and 1(13), the discussion in both sides' memoranda is limited to Subd. 1(13). However, because the caption of this section of defendants' brief reads "[p]laintiffs' claims for violation of the Deceptive Trade Practices Act should be dismissed on summary judgment," the court will construe defendants' motion for summary judgment on this count to encompass both subdivisions allegedly violated.

18. Further, plaintiffs have failed to demonstrate damages that are attributable to any statements made by American Family. While plaintiffs claim they suffered actual damages from the loss of all their policyholders, such alleged damages are a result of plaintiffs' termination, and cannot be attributed to any statements made by defendants.

ment in favor of defendants on this count is appropriate.

### F. Breach of Contract

Finally, Count VII of the complaint alleges that in terminating the contracts of plaintiffs, the American Family defendants violated the terms and conditions of the contracts and, accordingly, committed a breach of contract. The court will examine the claim of each plaintiff individually.

#### 1. Plaintiff Kemp

■ The relevant contractual provisions in Kemp's contract provide:

Section 6. Mutual Agreements.

It is mutually agreed that:

h. 1) Except as provided in paragraph 2) below, this agreement may be terminated by either the Company or the Agent with or without cause by giving written notice to the other and shall be deemed terminated as of the date specified in that notice. If both parties give notice, the earlier termination date shall control. This agreement shall automatically terminate upon the death of the Agent's President or upon the date his or her license to act as agent for the Company is suspended, revoked, or canceled[.] . . .

2) After two years from the Effective Date of this agreement, the Company will give the Agent notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. The Company will not terminate this agreement for those reasons for a period of six months after that written notice. In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i. or any other dishonest, disloyal or unlawful conduct by the Agent or any Shareholder, officer or licensed sales representative of the Agent; nor shall any notice be required in the event that the Company terminates substantially all agreements of this type throughout the Company or in a particular state or area.

American Family Corporate Agent Agreement with Gary L. Kemp, Exhibit 3 to Affidavit of Harvey H. Eckart (Docket No. 21) at P 183. Section 4.i., referred to above, provides that:

Agent Agrees:

To maintain a good reputation in the Agent's community and to direct Agent's efforts toward advancing the interests and business of the Company to the best of Agent's ability, to refrain from any practices competitive with or prejudicial to the Company and to abide by and comply with all applicable insurance laws and regulations.

*Id.* at P 180.

As is clear from these provisions, within two years of the effective date of "this agreement," either party may terminate the relationship "with or without cause by giving written notice to the other." The Corporate Agent Agreement in effect at the time of Kemp's termination explicitly provides that "this agreement is effective as of January 1, 1996." *Id.* at P 178. A separate condition in that agreement provides that "[t]his agreement supersedes all prior agency agreements between Agent or Agent's President individually and the Company, whether written or oral, and constitutes the entire agreement." *Id.* at P 187. While Kemp had been an American Family Agent for approximately thirty years, the agency agreement in effect at the time of his termination, which explicitly superseded all prior agreements, had been existence for a mere eleven days. This is well within the two year period prescribed by the agreement in which either party could terminate the relationship with or without cause. Therefore, no breach of contract occurred when American Family provided a letter to Kemp on January 11, 1996, indicating that his Agents Agreement was being terminated without prior notice. While both sides spend considerable time in their briefs arguing whether plaintiffs' lobbying activities constitute "disloyal" conduct or was a "practice prejudicial to the company," this issue is irrelevant in the case of plaintiff Kemp.

#### 2. Plaintiff McClure

■ The relevant provisions in plaintiff McClure's Agency Agreement are essentially the same as those outlined above:

It is mutually agreed that:

h. 1) Except as provided in paragraph 2) below, this agreement may be terminated

by either party with or without cause by giving written notice to the other and shall be deemed terminated as of the date specified in that notice. If both parties give notice, the earlier termination date shall control. This agreement shall automatically terminate upon your death or upon the date your license to act as an agent for the Company is suspended, revoked, or canceled.

2) After two years from the effective date of this agreement or after the termination date of your Agent Advance compensation Plan, whichever is later, the Company will give you notice in writing of any undesirable performance which could cause termination of this agreement if not corrected. The Company will not terminate this agreement for those reasons for a period of six months after that written notice. In no case shall notice of undesirable performance be required prior to termination if the performance in question involves a violation of Sec. 4.i. or any other dishonest, disloyal or unlawful conduct; nor shall any notice be required in the event that the Company terminates substantially all agreements of this type throughout the Company or in a particular state or area.

American Family Agent Agreement with Mary McClure, Exhibit 4 to Affidavit of Harvey H. Eckart (Docket No. 21) at P 119–20. Section 4.i., referred to above, provides here as well that:

Agent Agrees:

To maintain a good reputation in your community and to direct your efforts toward advancing the interests and business of the Company to the best of your ability, to refrain from any practices competitive with or prejudicial to the Company and to abide by and comply with all applicable insurance laws and regulations.

*Id.* at P 118.

The effective date of McClure's Agent Agreement was January 1, 1993. The two-year at-will termination clause is therefore inapplicable, as McClure was terminated on January 11, 1997, more than two years after the effective date of the agreement. To properly terminate McClure, therefore, American Family was required to provide notice of any undesirable performance and afford a six month period in which, presum-

ably, McClure could remedy any deficiency, unless the termination was for a practice prejudicial to the company or dishonest, disloyal, or unlawful.

Because American Family did not provide notice and afford the required six month remedial period, to avoid breach McClure's conduct must be shown to be prejudicial to American Family or dishonest, disloyal, or unlawful. It is at this point that the arguments of the parties concerning the meaning of these words and the scope of conduct falling within the pertinent definitions becomes relevant. Both sides debate whether the retention of Sposeto by plaintiffs constitutes conduct prejudicial to the company or was disloyal, and the court finds that there is a material question of fact whether this is so. Given the ambiguity of those terms, it should be left to a jury as the finder of fact to determine whether McClure's conduct justified an immediate termination without the six month grace period. If a jury determines that McClure's conduct was prejudicial or disloyal, then her termination without notice on January 11, 1996, was not a breach of the parties' agreement; however, if such activity is found not to be prejudicial or disloyal, then American Family breached the agreement.

## CONCLUSION

While it is clear that plaintiffs take issue with the reasons behind their termination as American Family agents and statements made in connection with that action, for the reasons stated the majority of their claims fail as a matter of law. After considering the file, record, and proceedings herein, the court concludes that summary judgment in favor of defendants is warranted on all counts except Count VII as it relates to plaintiff Mary McClure. Therefore, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment is granted in part and denied in part;

2. Summary judgment in favor of defendants is granted on all counts as they relate to plaintiff Gary Kemp;

3. Summary judgment in favor of defendants is granted on Counts I, II, III, IV, V,

and VI as they relate to plaintiff Mary McClure.