In re **SIMITAR ENTERTAINMENT, INC.,** Debtor.

**Simitar Entertainment, Inc., Plaintiff,**

v.

**UAV Corporation, Defendant.**

**Bankruptcy No. 00–31810.**
**Adversary No. 00–3174.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 21, 2002.

334

Michael L. Meyer, Minneapolis, MN, for Plaintiff.

Matthew R. Burton, St. Paul, MN, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court for trial. The Plaintiff appeared by its attorney, Michael L. Meyer. The Defendant appeared by its attorney, Matthew R. Burton. Upon the evidence received at trial and the arguments and memoranda submitted by counsel, the Court memorializes the following decision.

## INTRODUCTION

### Parties

The Plaintiff is a Minnesota business corporation. At all relevant times, it was engaged in the production and marketing of recorded video and music at its principal place of business in Maple Plain, Minnesota. The Plaintiff filed a voluntary petition under Chapter 11 on April 19, 2000. After selling certain of its assets with court approval during the pendency of its case, the Plaintiff obtained confirmation of a liquidating plan on June 7, 2001. Under the plan, a "Post–Confirmation Estate" was created. That entity received all rights to payment that had accrued to the Plaintiff pre-confirmation, the value of which was to be administered for the benefit of the creditors named in the plan.

The Defendant is a business corporation headquartered in Fort Mill, South Carolina. The acronym in its business name stands for "United American Video Corporation." At all relevant times it was engaged in the distribution of recorded video and audio products to supermarkets, drugstores, discount department stores, and similar retail merchants.

### Claims and Counterclaims Herein

The Plaintiff commenced this adversary proceeding while it was still a debtor in possession under Chapter 11. Its complaint makes a simple claim for collection on an account stated: it alleges that it sold and delivered goods of a value of $95,908.25 to the Defendant; that the Defendant has not responded to its demand for payment; and that the Plaintiff, therefore, is entitled to a money judgment against the Defendant.

In its answer, the Defendant raises eight tersely-identified affirmative defenses: failure to state a claim, waiver, payment, accord and satisfaction, estoppel, equitable estoppel, laches, and general bad faith under Minnesota's enactment of the Uniform Commercial Code ("UCC"). More specifically, it pleads that the product in question was so defective as to breach the UCC's warranties of merchantability and fitness for a particular purpose; that it seasonably revoked acceptance and rejected the goods; and that it is entitled to a setoff against the amount of the Plaintiff's claim for the value of the defective product.

The Defendant also raises a multi-count counterclaim, based on its allegation that the Plaintiff misrepresented the nature and quality of the goods that it was offering to the Defendant. It seeks affirmative relief under counts framed as follows:

1. For breach of contract and breach of an implied duty of good faith, it seeks offset and an award of incidental and consequential damages;

2. For a violation of Minnesota's Uniform Deceptive Trade Practices Act, it seeks injunctive relief and an award of costs and attorney fees; and

3. For a violation of Minnesota's Prevention of Consumer Fraud Act, it

seeks an award of damages, costs, disbursements, and attorney fees.

In its reply to the counterclaim, the Plaintiff alleges that the parties' contract specifically overrode the UCC's implied warranties; that in any event the Plaintiff's conduct did not amount to a breach of such warranties; and that the Defendant was aware of the product's content from an actual inspection, and hence may not complain of misrepresentation or nonconformity.

## FINDINGS OF FACT

Both parties participated in various sectors of the popular music business. The situs of their participation that is relevant to the present dispute might be termed the "midstream" of the industry—that is, the packaging of existing sound recordings, including multi-artist compilations, and the marketing and distribution of such products to retailers.[1] In this activity, neither party would have been considered a "major label." Both have dealt in collections of older recordings in the form recorded by the original artists. Both also have issued compilations of two forms in which established popular songs are rerecorded by persons other than the original artist, "covers" and "sound-alikes."[2]

Both parties distributed large lots of their own compilations of recordings, and those of other producers. Their customer bases were somewhat different. The Defendant distributed to general retailers—supermarkets, drug stores, discount department stores, and truck stops' retail centers—mainly in the southeastern part of the United States. The Plaintiff's retail distribution focused on specialized music store chains such as Best Buy and Musicland, and retailers with large music departments like Target; it also sold product to other intermediate distributors like the Defendant. The Defendant viewed its target end-customer demographic as culturally conservative and family-oriented; in the words of Frank Robertson, its director of audio and video, the typical retail buyer of the Defendant's offerings would be "35 and up" in age, "a mom pushing a cart through a grocery store or picking up a prescription in a pharmacy." On the other hand, the Plaintiff marketed to a broader end-audience; it handled recordings of more "mature subject matter" as well as middle-of-the-road popular listening fare.

To assemble product inventory for resale to retailers, the Defendant purchased from mainstream major record labels and studios, as well as jobbers of overstock and closeout merchandise. The Defendant's distribution business was highly seasonal, catering toward retail purchases connected with the various holidays of the fourth quarter of the year. Thus, its inventory cycle ran from evaluation of future tastes and trends in the first quarter, through

---

1. The Plaintiff and the Defendant also produced original recordings in their own right, holding proprietary rights to them. This fact is not germane to the dispute at bar.

2. The dispute at bar does not turn on the difference between these two varieties of release, but it is of some importance as background. A "sound-alike" is recorded via an intentionally-close mimicking of the vocal and instrumental style of the releasing artist. A "cover," on the other hand, is generally considered to be an interpretation of the original, with an overlay or outright substitution of the rerecording artist's own personal performing style onto the composer's tune and lyrics. Covers can be and often are recorded by industry stars who are prominent in their own right. Sound-alikes, on the other hand, are generally recorded by performers as-yet unblessed with fame, or by aggregations of studio musicians who don the semblance of a band for the nonce, and return to obscurity once paid for the session. As the trial testimony revealed, there are even sound-alikes of covers on the market.

locating suitable product in the second, receipt of inventory in the second and third, to assembly and shipment to its customers in the early fall. There is no evidence in the record that anyone from the Defendant ever communicated the specifics of its sales cycle to anyone at the Plaintiff, however.

At the times relevant to this adversary proceeding, Jerry Pettus, Sr. was a working principal of the Defendant and the chair of its board, and Mickey Elfenbein was the Plaintiff's chief executive officer. Pettus and Mickey Elfenbein had met in the mid–1990s; the Defendant had purchased inventory from the plaintiff's video division in 1998–1999. As noted earlier, Frank Robertson was the Defendant's director of audio and video. In that capacity, he was responsible for passing on the content of all of the Defendant's offerings to its retailer-customers. Mark Elfenbein [3] was a vice-president of the Plaintiff. At all relevant times, Robertson knew both Elfenbeins, being "casually acquainted" with Mickey and communicating more frequently with Mark.

During discussion at industry shows in late 1990 and very early 2000, Mickey Elfenbein told Pettus that the Plaintiff had inventory of original-artist recordings available on a closeout basis. Under cover of a letter dated January 11, 2000, Mickey Elfenbein sent Pettus lists of overstock inventory in compact disc ("CD") and cassette format that the Plaintiff was offering. These lists included stock numbers, brief titles, and the available unit quantities for each item.

The January 11, 2000 list included titles that featured the names of established artists popular between the 1940s and the 1970s.[4] It also encompassed a large number of more generally-worded titles—clearly compilations or anthologies—many of them including the words "DJ Mix," "The Number Ones," "# 1 Hits," and "80's Country." Finally, the list had entries worded as follows, for several items dwelt on at length in the trial testimony:

DJ EROTIC MIX

BIG BALLERS—EXPLICIT

Big Ballers—(Non–Explicit)

Feel the Buzz: Spacin'

Feel the Buzz: No Pain'

Feel the Buzz: Hit Time

There were three components to the list: a four-page segment that had no heading, including both CDs and cassettes; two pages entitled "PICKWICK CLOSEOUT (CASSETTES)"; and a single page of CDs and cassettes entitled "SIMITAR PRODUCTS LISTING." With the list, Elfenbein sent a copy of a Christmas-song compilation and several hundred samples of more general material from the lists.

Around this time, during a meeting at the MITA[5] festival in Cannes, Frances, Robertson and Mark Elfenbein "talked about the mechanics of a deal" on the Plaintiff's overstock offer. At that time, Robertson told Mark Elfenbein about the Defendant's standards for the artistic content and cover art of music products that it placed—i.e., that the Defendant was "highly conservative in [its] purchasing style."

---

3. Apparently related to Mickey Elfenbein, though the precise family tie was not revealed at trial.

4. The names included country-and-western, jazz, and rock artists like Dave Dudley, Charlie McCoy, Patsy Kline, Lena Horne, Sarah Vaughan, Mahalia Jackson, Glen Miller, Mel Torme, Buddy Rich, Chick Corea, and the Climax Blues Band.

5. Apparently this acronym stands for "Music Industry Trade Association," the host of the largest regularly-scheduled music trade show in the world.

There is no evidence in the record that Robertson told Mark Elfenbein that the Defendant would not accept and resell sound-alike recordings, at this time or any other.

After receiving a follow-up inquiry from Elfenbein via fax transmission on January 17, 2000, Pettus "just glanced at" the samples and their packaging. From this review, he concluded that "a majority that came in were original artists." The samples did not include copies of the *Feel the Buzz* titles, though they did include the *Big Baller* items. Robertson also reviewed the list and the samples in more detail than Pettus had. Noting that the "large" grouping of samples contained "lots of original-artist recordings ... not commonly seen as overstock previously," he decided that such stock "could be attractive to retailers." At trial, he initially testified that he found "nothing offensive in the titles." Later in his testimony he stated that in any order he would have made, he "would have skipped" such items as the *Big Baller* titles, *DJ Erotic Mix,* and a listed hardcore rap release due to the content of these items. Under cross-examination he admitted that the *Big Baller* titles had been in the sample package and he had found them "highly inappropriate" for the Defendant's customer base. There is no evidence in the record that Robertson ever communicated this judgment to anyone at the Plaintiff.

Robertson then took Mark Elfenbein's suggestion that he review the listings on the *amazon.com* Website to ascertain the content of titles for which the Plaintiff had not given samples. When he did this, he did not check those for the *Feel the Buzz* CDs.[6]

Robertson then assembled a proposed order from the titles on the list. He and Pettus concluded the title choices and order sizes were an appropriate buy at the prices they had discussed with their counterparts at the Plaintiff, $2.00 per unit for CDs and $1.25 per unit for cassettes. They then decided to proceed with the order, accepting the additional requirement that the Plaintiff had imposed for that price on a quick sale: that the Defendant purchase the 100,000 units of inventory that remained at the Plaintiff's Terre Haute, Indiana warehouse, sight unseen and at its risk, for $.25 per unit, and remove them from that site as quickly as possible so the Plaintiff could turn the premises back to the landlord.

On January 28, 2000, Pettus faxed Mickey Elfenbein confirmations of the Defendant's intent to purchase a total of 178,210 units of various titles on CD and 38,154 units of various titles on cassette. The attachments to this memo were in the same table format, and had the same line-entries for titles, as the "SIMITAR TITLES LISTING" the Plaintiff had earlier given the Defendant. At the time, the Defendant was outfitting several thousand retail stores with a new music rack system; Pettus contemplated initially stocking these customers with this inventory from the Plaintiff. Early in the first week of February, 2000, the Plaintiff checked with several credit references the Defendant had supplied, and Elfenbein concluded that the Defendant had had an accept-

---

**6.** At trial, Robertson admitted that he "could have done a more thorough job" in using this readily-available tool for evaluation of CD cover and content. (Mark Elfenbein had told him that all of the proffered titles would appear on the Website.) He also acknowledged noticing the distinctive series title, but stated that he had concluded it had been derived from a current hip, "streety" term, evocative of "extreme" sports, and had not considered it as drug-related. Neither counsel inquired as to whether he had considered the subsidiary titles of the three CDs in the series.

able payment history with other suppliers of inventory.

After completing "individual item set-ups" in its inventory system, the Defendant generated a purchase order for a portion of the previously-specified items, with a stated shipping date of February 7, 2000. The portion included a total of 3,455 cassette units of the *Feel the Buzz* titles.

Before the Plaintiff shipped, however, Mickey Elfenbein asked Pettus to enter a "standard terms of sale agreement" to firm up the parties' arrangement for a sale on credit. He also asked Pettus to provide a schedule of the retail accounts with which the Defendant would place the product.[7]

On February 15, 2000, Pettus signed a document entitled "Additional Terms and Conditions of Sale." That document included the following language:

EXCLUSIONS AND LIMITATIONS, WARRANTY, EXCEPT AS EXPRESSLY NOTED BELOW ... ALL IMPLIED WARRANTIES, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTIBILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED. SELLER HEREBY DISCLAIMS, AND BUYER HEREBY WAIVES, ANY TORT LIABILITY, AND LIABILITY FOR ANY COSTS, LIABILITIES, LOSS OF GOODWILL OR ANY OTHER GENERAL, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES INCURRED BY BUYER OR BUYER'S CUSTOMERS IN CONNECTION WITH THE PURCHASE AND SALE OF THE MERCHANDISE. BUYER'S SOLE REMEDY SHALL BE FOR REFUND OR PURCHASE PRICE OF THAT PORTION OF THE MERCHANDISE THAT IS REJECTED AND DEFECTIVE UPON INITIAL DELIVERY FROM SELLER TO BUYER OR ITS DESIGNEES.

In its prefatory paragraph, this document noted that the parties

... agree[d] to be bound by all of the following terms and conditions governing the purchase and sale of the merchandise listed in Seller's invoice attached hereto and incorporated herein by reference...

The Plaintiff, however, did not prepare invoices for attachment before the execution of the document.[8] Notwithstanding the facial recitations of the terms-and-conditions document, the parties clearly intended it to govern the Plaintiff's *future* sales of audio inventory on credit, which necessarily included the mid-February sale but was not limited to it.

During this period, the Defendant issued additional purchase orders dated February 11, 2000, for groups of named recordings, including 11,000 CD units of the *Feel the Buzz* titles and various rock, soul, gospel, "love," country, disco, and blues compilation CDs. At the Defendant's request, the Plaintiff issued a consolidated invoice dated February 18, 2000, for "Misc CD's" and "Misc Cassettes" of a stated total price of

---

**7.** The purpose for this disclosure was to ensure that there was no overlap between the parties' retail placements, as the Plaintiff had previously placed the same titles with its own customers at a higher price. Pettus executed a document with this information on February 16, 2000.

**8.** There are no invoices attached to the signed copy of this document that is in evidence. No witness ever testified that such invoices were prepared or attached before the execution of the document, or contemporaneously with it. The invoice for the full shipment in evidence as Plaintiff's Exhibit 2–A is dated February 25, 2000, ten days after the date on the terms-and-conditions document.

$370,480.00. The payment terms were given as "1/3 cash in advance, 2/3 net 60." All told, as Robertson admitted at trial, this was the Defendant's single largest inventory purchase in 2000.

The first shipment on this order was packed on wrapped pallets, 45 inches square and 54 inches tall; the Defendant received it over a two-week period in February 2000. By early April 2000, the Defendant's warehouse employees had broken down the full shipment for warehouse storage and processing, and had placed half of its content with retailers. The retailer placement included several hundred units of the *Feel the Buzz* titles, though this was a very small fraction of the number actually received.

In early April, 2000, Elfenbein called Pettus to advise him that the Plaintiff had additional product on which it "could make a special price" to the Defendant, as long as the Defendant "turned [the offer] around" with an order within a day. After reviewing the Defendant's needs with Robertson and others in this department, Pettus asked Elfenbein for a list of available items. Elfenbein sent that to Pettus by fax on April 14, 2000. This was entitled "SELL OFF PRODUCTS," and included line-entries for the two *Big Ballers* titles and *DJ Erotic Mix.* Of the remaining titles, only one included the name of an established major artist, Charlie McCoy; the balance was an assortment of the same generic titles as had been present on the earlier list, with rock, pop, dance, rap, hip hop, and country themes. The list also included Spanish-language items in a greater proportion than had been on the first lists, a "BIBLE 4–PACK," and several collections of gospel songs.

From Elfenbein's general remark, the content of this list, and the Defendant's experience in the first shipment, Pettus became "under the impression" that the product would be "all original artists like the first batch." However, at no time did Elfenbein tell Pettus that the content of this product would be "more of the same" material as had made up either the first offer or the first order. Elfenbein did not discuss the nature of the content with Pettus at all, and made no representations as to whether it was original-artist material or sound-alikes. The price that Elfenbein offered for a quick sale on this lot of inventory was $1.50 per CD unit, 25 percent less than the price that the Defendant had found attractive for the first sale.

Pettus did not ask Elfenbein for further samples. At this time, Pettus knew that the Plaintiff was having difficulties with Congress Financial and First Union Bank, two of its largest creditors, and he turned down Elfenbein's solicitation that he personally invest some money in the Plaintiff.

After Elfenbein's second solicitation, Pettus concluded that "this was an opportunity buy, a good price." The Defendant still had half of the inventory from the first purchase, but Pettus felt that getting more inventory at an even lower cost could not be passed up, to buy against the Defendant's anticipated future needs. He "glanced at the list" that the Plaintiff had sent, and turned the matter over to Robertson, telling him that the Plaintiff was offering "more of the same." Robertson understood that the Defendant would get "a little sharper price" if it "turn[ed] it around immediately." While again rejecting the *Big Baller* and *DJ Erotic Mix* titles, the Spanish-language inventory, and certain of the rap items as unsuitable for its customer base for one reason or another. Robertson made selections from the title list and prepared a second order from the Plaintiff.

In doing this, Robertson thought the Defendant would be getting original-artist, original-hit compilations. To get to that

point, however, he had drawn his own conclusions from the similarity of the wording in the offered items' titles to that in the first shipment's titles. He had not asked for additional samples, he had not checked the *amazon.com* Website, and he had not done any other investigation. At this time, Robertson was aware that the 100,000 units that the Defendant had removed from the Plaintiff's Terre Haute warehouse were from a single label, "esoteric, unsellable, and not appropriate for an impulse rack" like the ones Defendant was stocking for its customers.

On April 14, 2000, the Defendant issued a purchase order for another shipment of CDs, of a total price of $196,239.00, for a scheduled shipping date of April 30, 2000. Other than the Charlie McCoy selection, the titles on this purchase order were all generically-worded for compilations in the categories of dance, swing, gospel, country, rock, hip hop, and pop.

The Defendant received this shipment at its warehouse on April 27, 2000. It was packed in the same way as the first shipment. The members of the Defendant's warehouse staff did not break down the packaging on this shipment or inspect the contents in any way at that time. Instead, they shelved it on original pallets for later processing, "basically just count[ing] and put[ting] it up," in Robertson's words.

In mid-May, 2000, Elfenbein advised Pettus that the Plaintiff had more of the "Bible product," a 4–CD package of Christian-themed content, and asked him if the Defendant wished to purchase it. Thinking this item made a "terrific match" for the Defendant's customer base in the southeastern United States, Robertson placed an order for 3,874 units of this item on May 22, 2000, at the same $3.00 unit price as it had paid for the item in the second order. The Defendant received and processed this shipment on May 22, 2000.

At some point between the Defendant's receipt of the second shipment and May 22, 2000, Pettus learned of the Plaintiff's Chapter 11 filing. He or someone else had informed Robertson of the fact by May 22, 2000. At trial, Pettus stated that this revelation "raised a concern" for the Defendant at the time. This "concern" was manifested in only one way, however: the Defendant immediately ceased to comply with the payment terms of the parties' agreement. Pettus instructed the Defendant's chief financial officer to "hold payment for awhile," in order to preserve a recourse "if anything out there was defective." [9]

It was not until early August, 2000 that the Defendant's warehouse employees began to break down the second shipment and to process it in earnest.[10] Upon reviewing the content with the employees, Robertson discovered a substantial number of compilations of sound-alike recordings of recent pop, rock, and hip-hop hit songs.[11] He decided that this sort of mate-

---

9. It appears from the Defendant's records—a "check history report," received into evidence as Defendant's Exhibit Z—that it paid for the first order in full, or very nearly so, and within the time set by the Plaintiff's credit terms. However, upon Pettus's decision to "put things on hold" the Defendant issued only four checks to the Plaintiff over a three-month period after mid-May. Each was in a round multiple of $10,000.00, and they totaled $140,000.00.

10. Robertson acknowledged that this inspection and processing took place "quite some time" after its physical acceptance.

11. The Defendant introduced several examples of these items into evidence. Defendant's exhibits DD–3, DD–4, and DD–7 are titled *# 1 Rock Hits, Volume 1,* and Volumes 1 and 2 of *# 1 Pop Hits.* The song content on these discs was presented by the original recording artists in a great variety of musical

rial was not what he had intended to order from the Plaintiff. In addition, Robertson found that the three different *Feel the Buzz* titles in the first order were compilations of rock and pop songs from the late 1960s and early 1970s with drug-oriented themes, in the original-artist versions.[12] Robertson testified to feeling betrayed and "pretty ugly" upon these discoveries.

During the third week of August, 2000, Alton G. Murchison, III, the Defendant's vice-president, spoke with Don Swenson, the Plaintiff's interim chief executive officer while it was in Chapter 11. He protested much of the material shipped to the Defendant on the second order, and denied any further liability to the Plaintiff for the invoiced price for that material. Murchison followed up this call with a letter to Swenson dated August 31, 2000. Identifying various lots of sound-alike and cover

recordings and the *Feel the Buzz* series by name, Murchison stated that they were "not the product represented to us, and [were] wholly unacceptable." Insinuating that the Plaintiff had defrauded the Defendant "the very day that [the Plaintiff] filed for protection under the Bankruptcy Code," Murchison denied that the Defendant was liable to the Plaintiff for the $96,763.75 invoice price of the product that he had identified.[13]

The conversation between Murchison and Swenson in mid-August 2000 and the follow-up letter were the first protests that the Defendant made, formally or informally, over the content or quality of either shipment.[14] The Defendant has paid all other amounts invoiced by the Plaintiff for both shipments, but has not paid the sums billed by the Plaintiff for the product that is in dispute.[15] It has sold the original-

---

styles. The "Pioneer Creek Gang," however, is the only identified performer on these items. One is tempted to attribute remarkable versatility to the aggregation that bore this name. Then one notices from the same CD label that the Plaintiff had its business offices on Pioneer Creek Drive in northwest-suburban Minneapolis. The other exemplars received as Defendant's exhibits DD–1, DD–2, DD–5, and DD–6, are all *Number 1 Hits* of the varieties of *Party*, *Pop*, *Dance*, and *Hip Hop*. They do not even identify recording performers by name on their external packaging. The internal labels for these compilations identify individual performers, but these persons and groups could not be called well-known, notorious, or even recognizable by name.

**12.** The *Feel the Buzz* discs are in evidence as Defendant's exhibits GG–1 through GG–3. They contain many grizzled remnants of an earlier time's simple-minded permissiveness. The more emblematic ones include "In–A–Gadda–Da–Vida," "Psychotic Reaction," "One Toke Over the Line," "Panama Red," "Don't Bogart That Joint," and "I Got Stoned and I Missed it." Much of the discs' content contains explicit references to controlled substances; almost all of it is evocative of the chemically-propelled "alternate lifestyles" of three decades ago and more.

**13.** This amount differs by some $800.00 from the amount shown on the Plaintiff's records of accounts receivable, which was the amount for which it sued the Defendant here. The discrepancy is attributable in large part to a credit memo issued by the Plaintiff to the Defendant's account in early May 2000.

**14.** Several employees in the Plaintiff's collection department had been calling the Defendant on various payment issues since mid-March, 2000. Under the Plaintiff's practice, such employees were to record customers' stated reasons for nonpayment in their log notes. The Plaintiff's records of these notes through late August, 2000, do not contain any indication of complaints about the quality or content of the goods.

**15.** At trial, the Defendant offered some fairly vague evidence—testimony and documentary—that the Plaintiff had delivered certain items in smaller numbers than ordered and invoiced. Apparently the point of this evidence was that even were the Plaintiff to prevail, its recovery should be less than its demand. There was no proof that the Defendant had ever contested the amount of its liability on this ground before. The scattered proffers on this issue were presented only in

artist items from the second shipment, but has the balance of that shipment and the *Feel the Buzz* titles in storage in its warehouse.

## CONCLUSIONS OF LAW

### I. THE GOVERNING LAW, IN GENERAL

#### A. Theories of Suit and Defense

The parties' dispute is governed by Article 2 of Minnesota's enactment of the UCC, MINN. STAT. § 336.2–101 *et seq.;* both sides acknowledge that their transactions were sales of goods within the scope of that statute.

The Plaintiff's position-in-chief is premised on the most basic principles of contract, and barely entails the minutiae of Article 2. As the Plaintiff would have it, the parties had a contract for the sale of goods; the Plaintiff delivered the goods; the Defendant accepted them; the Defendant paid only a portion of the amount the Plaintiff invoiced pursuant to the contract; and, therefore, the Plaintiff is entitled to recover the unpaid balance.[16]

■ The Defendant's response is that it was excused from its contractual duty of payment as to a portion of the goods delivered because the Plaintiff breached statutory warranties under Article 2, which justified the Defendant in revoking its acceptance of the goods in controversy. As the proponent of this theory, the Defendant must "show . . . the existence of the warranty." UCC COMMENT TO MINN. STAT. § 336.2–314, ¶ 13. Then, "[t]he burden is on [the Defendant] to establish any breach with respect to the goods accepted."

MINN. STAT. § 336.2–607(4). *See also Luther v. Standard Conveyor Co.,* 252 Minn. 135, 140–141, 89 N.W.2d 179, 184 (1958) (decided under predecessor statute, the Uniform Sales Act).

As to the goods in controversy, the Defendant maintains that the Plaintiff breached two statutory warranties, the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. These are distinct covenants, each governed by its own considerations.

#### B. MINN. STAT. § 336.2–314: Implied Warranty of Merchantability

■ Under Article 2,

Unless excluded or modified . . ., a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.

MINN. STAT. § 336.2–314(1); *Int'l Fin. Serv., Inc. v. Franz,* 515 N.W.2d 379, 384 (Minn.App.1994), *aff'd in part and rev'd in part,* 534 N.W.2d 261 (Minn.1995). As with any implied warranty, this one is imposed by operation of law—here, a statute. Absent express exclusion, the warranty applies regardless of the affirmative intentions of either party. *Dougall v. Brown Bay Boat Works and Sales, Inc.,* 287 Minn. 290, 297, 178 N.W.2d 217, 222 (1970). *See also Riviera Imports, Inc. v. Anderson Used Cars, Inc.* 268 Minn. 202, 207, 128 N.W.2d 159, 163 (1964).

By making such a warranty, the seller guarantees to the buyer that the goods purchased (1) "pass without objection in the trade under the contract description," (2) are "fit for the ordinary purposes for which such goods are used,"

---

surrebuttal testimony and were never quite tied together in evidence or closing argument. This theory and its perfunctory presentation are to be rejected, as lacking in credibility.

**16.** While the Plaintiff does not cite any provision of Article 2 in support of its case-in-chief, it all boils down to "[t]he buyer must pay at the contract rate for any good accepted." MINN. STAT. § 336.2–607(1).

and (3) "conform to the promises or affirmations of fact made on the container or label."

*Int'l Fin. Serv., Inc. v. Franz,* 515 N.W.2d at 384 (citing MINN. STAT. § 336.2–314(2) [17]).

■ The Minnesota Supreme Court seems to have identified the central consideration of the implied warranty of merchantability as a requirement that goods be " 'fit for the *ordinary purposes* for which such goods are *used.*' " *Peterson v. Bendix Home Systs., Inc.,* 318 N.W.2d 50, 53 (Minn.1982) (quoting MINN. STAT. § 336.2–314(2)(c)) (emphasis added). "This warranty is breached when the product is defective to a *normal buyer making ordinary use* of the product," *id.* (emphasis added); it "simply means that the product is reasonably fit for the general purposes for which it is manufactured and sold," *Dougall v. Brown Bay Boat Works and Sales, Inc.,* 287 Minn. at 294, 178 N.W.2d at 220. The "ordinary purposes . . . envisaged in the concept of merchantability . . . go to uses which are *customarily* made of the goods in question." UCC COMMENT TO MINN. STAT. § 336.2–315, ¶ 1 (emphasis added).

■ To make out a breach of this warranty, a buyer need not demonstrate "a specific defect in materials or workmanship." *Int'l Fin. Serv., Inc. v. Franz,* 515 N.W.2d at 384, 515 N.W.2d at 384. To sustain an action based on a breach, however, the buyer must show "a causal relationship between the breach and [a] loss sustained" by the buyer. *Int'l Fin. Serv.,*

*Inc. v. Franz,* 534 N.W.2d at 265; UCC COMMENT TO MINN. STAT. § 336.2–314, ¶ 13.

## C. MINN. STAT. § 336.2–315: Implied Warranty of Fitness for a Particular Purpose

Article 2 provides, as well, that

[w]here the seller at the time of contracting has any reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified . . . an implied warranty that the goods shall be fit for such purpose.

MINN. STAT. § 336.2–315. This provision codifies a rule previously recognized under the Uniform Sales Act and under the common law. *E.g., Luther v. Standard Conveyor Co.,* 252 Minn. at 140, 89 N.W.2d at 184 (Minnesota law recognizes "the principle that, where the buyer fully informs the seller of his particular needs and the seller undertakes to supply an article suitable for the purpose intended, there is an implied warranty that the article will be fit for that purpose . . ."); *Kopet v. Klein,* 275 Minn. 525, 528, 148 N.W.2d 385, 389 (1967); *Riviera Imports, Inc. v. Anderson Used Cars, Inc.,* 268 Minn. at 207, 128 N.W.2d at 163 ("where the buyer informs the seller of the purpose for which an article is to used, there is an implied warranty of fitness for that use . . .").

---

**17.** The full text of this statute is:

(2) Goods to be merchantable must be at least such as

 (a) pass without objection in the trade under the contract description; and

 (b) in the case of fungible goods, are of fair average quality within the description; and

 (c) are fit for the ordinary purposes for which such goods are used; and

 (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

 (e) are adequately contained, packaged, and labeled as the agreement may require; and

 (f) conform to the promises or affirmations of fact made on the container or label if any.

 Under the UCC provision, a party alleging a breach of this warranty must prove:

1. The seller had reason to know of the buyer's particular purpose;

2. The seller had reason to know the buyer was relying on the seller's skill or judgment to furnish appropriate goods; and

3. The buyer actually relied on the seller's skill or judgment.

*Willmar Cookie Co. v. Pippin Pecan Co.,* 357 N.W.2d 111, 115 (Minn.App.1984). To establish the seller's knowledge of the buyer's needs,

> the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended ..., if the circumstances are such that the seller has reason to realize the purposes intended ...

UCC COMMENT TO MINN. STAT. § 336.2–315, ¶ 1. *See also Riviera Imports, Inc. v. Anderson Used Cars, Inc.,* 268 Minn. at 207, 128 N.W.2d at 163 (seller "may be informed of the intended use ... by implication"). The statute's "particular purpose" "envisages a specific use by the buyer which is peculiar to the nature of his business ..." UCC COMMENT TO MINN. STAT. § 336.2–315, ¶ 2. The seller's knowledge of the buyer's reliance may also be deemed to it by a process of inference; if the surrounding circumstances would give the seller reason to believe that the buyer would rely on its judgment, the buyer need not have expressly articulated its reliance to the seller. UCC COMMENT TO MINN. STAT. § 336.2–315, ¶ 1. The buyer must have relied in fact, however. *Id.*

### D. MINN. STAT. § 336.2–316: Exclusion of Warranties

 As to the two warranties just discussed Article 2 provides:

> ... To exclude or modify the implied warranty of merchantability ... the language must mention merchantability and in the case of writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous.

MINN. STAT. § 336.2–316(2). This provision expressly contemplates that a buyer can disclaim Article 2's implied statutory warranties. *Transport Corp. of America, Inc. v. Int'l Business Machines Corp., Inc.,* 30 F.3d 953, 958 (8th Cir.1994). No matter what their form, such exclusions must be express—"by conspicuous language or other circumstances which protect the buyer from surprise." UCC COMMENT TO MINN. STAT. § 336.2–316, ¶ 1. Written disclaimers of implied warranties must be "conspicuous." UCC COMMENT TO MINN. STAT. § 336.2–316, ¶¶ 3 and 4. Whether the disclaimer is conspicuous within the statute's contemplation is an issue for the court. *Minnesota Mining and Mfg. Co. v. Nishika, Ltd.,* 885 S.W.2d 603, 629 (Tex.App. 1994), *rev'd on other grounds,* 953 S.W.2d 733 (Tex.1997) (applying Minnesota law.) Where an exclusion of both warranties is in a purchase agreement or other written contract for a sale; is identified as a disclaimer; is in large print; and mentions "merchantability" as such, it is effective. *Dubbe v. A.O. Smith Harvestore Prods., Inc.,* 399 N.W.2d 644, 647 (Minn.App.1987) *rev. den.* (Minn. March 13, 1987); *Am. Computer Trust Lsg. v. Jack Farrell Implement Co.,* 763 F.Supp. 1473, 1487 (D.Minn.1991), *aff'd,* 967 F.2d 1208 (8th Cir.1992), *cert. den.* 506 U.S. 956, 113 S.Ct. 414, 121 L.Ed.2d 338 (1992).

### E. MINN. STAT. § 336.2–608: Revocation of Acceptance

Where goods do not match a buyer's due under a contract of sale, Article 2 provides, in pertinent part:

The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

. . .

> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

MINN. STAT. § 336.2–608(1); *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 353 (Minn.1978); *Holland v. Dick Youngberg Chevrolet–Buick, Inc.*, 348 N.W.2d 770, 773 (Minn.App.1984).[18]

 For the purposes of MINN. STAT. § 336.2–608(1), "[g]oods conform to the contract when they are in accordance with the obligations under the contract." *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d at 353 n. 3 (citing MINN. STAT. § 336.2–106(2)). To support revocation of acceptance, the nonconformity cannot be a technical or a minor one; it must substantially impair the value of the goods to the buyer, in the sense of substantially interfering with their use or operation or with the purpose for which they are purchased.

*Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d at 354; *Holland v. Dick Youngberg Chevrolet–Buick, Inc.*, 348 N.W.2d at 774. Impairment is to be measured against the particular needs of the buyer. *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill.App.3d 966, 51 Ill.Dec. 245, 255, 420 N.E.2d 659, 669 (1981). This is an issue that requires fact-finding, but once the basic facts are found the question of whether they evidence substantial impairment is one of law. *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d at 354.[19]

 To be effective, revocation of acceptance must be timely:

> Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it . . . It is not effective until the buyer notifies the seller of it.

MINN. STAT. § 336.2–608(2);[20] *Jacobs v. Rosemount, Dodge–Winnebago South*, 310 N.W.2d at 76; *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d at 353; *Holland v. Dick Youngberg Chevrolet–Buick, Inc.*, 348 N.W.2d at 773. On this issue, the first question is the time as of which the buyer became aware of the nonconformity, or

---

**18.** The courts in *Durfee* and *Holland* framed the elements of revocation of acceptance with reference to the first alternative under MINN. STAT. § 336.2–608(1) alone—that is, sub-subdivision (a). That alternative contemplates the situation where a buyer has accepted goods that have patent defects and obviously do not conform to contractual requirements. Both *Durfee* and *Holland* involved sales of motor vehicles, in which some of the goods' defects emerged soon after the hapless buyers left the dealers' lots; neither decision refers to defects being evident before the buyers drove out, and the cited defects would seem such as to emerge only after several miles of use. It is not clear why the courts on these two decisions did not frame their recitation of elements in light of sub-subdivision (b), which clearly envisions the revocation of an acceptance that was unknowing in the first instance, due to nonconformities that were not

readily discoverable before acceptance. Given the means of the Plaintiff's performance, sub-subdivision (b) is the alternative applicable here. Both counsel apparently acknowledge this, as the issue was never broached.

**19.** There is a suggestion to the contrary in the reference in UCC COMMENT TO MINN. STAT. § 336.2–608 ¶ 2, to "nonconformity . . . as will *in fact* cause a substantial impairment of value." (Emphasis added.) However, one must defer to the Minnesota Supreme Court's construction.

**20.** *Cf.* MINN. STAT. § 336.2–607(3) (if buyer has accepted tender, it must notify seller within reasonable time after buyer discovers or should have discovered seller's breach, or be barred from any remedy).

should have become aware. *Kopet v. Klein,* 275 Minn. at 530–531, 148 N.W.2d at 390. If the buyer did not inspect the goods upon acceptance, and the court must identify the time as of which the seller should have been aware of the nonconformity,

> [t]he courts may permit buyers to delay inspection until they are ready to resell or use the goods if there is proof of custom or trade usage.

*GNP Commodities, Inc., v. Walsh Heffernan Co.,* 51 Ill.Dec. at 251, 420 N.E.2d at 665.

■ After the buyer's actual or deemed discovery of the nonconformity,

> [t]he issue of what constitutes a reasonable time [for the buyer to notify the seller of its] revocation of acceptance is a ... question that depends on the facts and circumstances of the case.

*Johannsen v. Minnesota Valley Ford Tractor Co.,* 304 N.W.2d 654, 657 (Minn. 1981).

### F. Common–Law Fraud

■ In Minnesota,

[t]he elements of fraudulent misrepresentation are:

1. There must be a representation;
2. That representation must be false;
3. It must have to do with a past or present fact;
4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to have the other person induced to act, or justified in acting upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance upon the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

*Florenzano v. Olson,* 387 N.W.2d 168, 174 n. 4 (Minn.1986) (citing *Davis v. Re–Trac,* 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967)). *See also Berryman v. Riegert,* 286 Minn. 270, 275, 175 N.W.2d 438, 442 (1970).

■ Minnesota law also recognizes a cause of action for negligent misrepresentation, though it lies only when the alleged tortfeasor was supplying information "in the course of a transaction in which one has a pecuniary interest, or in the course of one's business, profession, or employment." *Florenzano v. Olson,* 387 N.W.2d at 174 (citing *Bonhiver v. Graff,* 311 Minn. 111, 122, 248 N.W.2d 291, 298–299 (1976)). The *Bonhiver v. Graff* court adopted the definition of negligent misrepresentation from the RESTATEMENT SECOND OF TORTS. *Id.* at n. 3. When that definition is compared to the traditional framing of elements for intentional fraud, it is clear that the two differ only on the scienter element. *See, in general,* discussion in *Florenzano v. Olson,* 387 N.W.2d at 173–174.

### G. MINN. STAT. § 325D.44: Deceptive Trade Practices

■ Under Minnesota's Enactment of the Uniform Deceptive Trade Practices Act,

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
> . . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

MINN. STAT. § 325D.44 subd. 1. A party that proves that its opponent has engaged in a deceptive trade practice is entitled to prospective injunctive relief and costs, and an award of attorney fees if it proves willfulness on the part of the perpetrator. MINN. STAT. § 325D.45 subd. 2. These remedies are cumulative to those available under common law or separate statute on the same factual showing. MINN. STAT. § 325D.45 subd. 3. To make out a deceptive trade practice actionable under the statute, a complainant is not required to prove that "actual confusion or misunderstanding" resulted from the respondent's conduct in trade. MINN. STAT. § 325D.44 subd. 2; *McClure v. Am. Family Mut. Ins. Co.*, 29 F.Supp.2d 1046, 1065 (D.Minn. 1998), *aff'd*, 223 F.3d 845 (8th Cir.2000). It is only necessary to prove that the conduct creates a "likelihood" of confusion. *McClure v. Am. Family Mut. Ins. Co.*, 29 F.Supp.2d at 1065; *Claybourne v. Imsland*, 414 N.W.2d 449, 451 (Minn.App. 1987). Given the nature of the types of conduct described in the statute's enumerated examples, it is clear that "confusion" within the statute's ambit is the mistaking of the identity of a product, or one of a product's essential aspects, for that of another product.

### H. MINN. STAT. § 325F.69: Consumer Fraud

Under Minnesota law,

[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, *is enjoinable as provided herein.*

MINN. STAT. § 325F.69 subd. 1 (emphasis added).

## II. APPLICATION OF THE GOVERNING LAW

### A. Initial Observations

At the outset it should be noted that the two parties were at relative parity in their relationship, in two major ways: they both had broad past involvement in the music industry, and they both were well-acquainted with the nature of the product that producer-distributors like themselves placed with retailers. They were also at a real parity in their experience with each other. Significantly, that parity was at a low level; they had not had a long history of successful transactions or mutual satisfaction. Neither side had a basis for any deeply-rooted personal trust in the other. Reasonably, each could have approached the events as a pair of transactions in close succession between two relative strangers, "just business," and perhaps the basis for a *future* reposal of deeper trust. It was a situation for a moderate degree of caution, however, both in itself and because of the surrounding circumstances. The Plaintiff was contemporaneously under financial strain. That fact was known to the participants on the Defendant's behalf. The Defendant certainly was on notice of the possible concomitants of that status, including the Plaintiff's need to get its finances as liquid as possible.

In short, this was not a case of a sharp gradient of sophistication, bargaining power, or access to material information. Nor is it one where the complainant is fairly to be characterized as an unwitting dupe. The Defendant's principals clearly had made their company's past success in a very competitive industry-no doubt by being hard-headed when necessary, seizing

apparent opportunities as their business judgment dictated, and learning to live with the risks inherent in doing so.

With the tone of the analysis being thus set, it is important to identify the contentions that underlie the Defendant's affirmative defenses. To support its bid to undo a large part of the parties' transactions, the Defendant sets up two sorts of alleged nonconformity or breach. Each one goes to a separate component of the goods. The components are the three *Feel the Buzz* titles, which were a portion of the first order, and the large number of assorted sound-alike recordings in the second order.

The threshold question is whether the salient characteristics of either component amount to a breach of either of the statutory implied warranties. If either component hits that mark, the issue is the consequence, if any, for the Plaintiff's right to recover the balance of the contract price, under the events as they transpired.

### B. Implied Warranty of Merchantability

■ Under the legal authority cited earlier, the finder of fact must fix an objective baseline for the implied warranty of merchantability: the "ordinary" use to which a good of the sort in question would be put by a "normal" buyer. In its two other prongs, the statute sets up subsidiary considerations. The first is whether the good would pass in the trade under the description in the sale contract. This again contemplates an objective baseline, of trade standards of description and function. The second is whether, given its actual utility, the good is packaged under misleading representations or promises.

In the end, the Defendant's claim for a breach of this warranty fails on its threshold, for want of proof on all three of those points.

The analysis is initially hampered because the Plaintiff has not identified a "general purpose" for the CDs and cassettes that would be frustrated by the nonconformities that it alleges. The implied warranty of merchantability was established to protect a buyer's right to promote or achieve such purposes, however they are defined. As the party asserting the protection of that warranty, the Defendant had the burden to identify and prove up its predicates, including such a purpose.

In the absence of such guidance from the Defendant, one must proceed by logical extension from the nature of the Defendant's needs. The buyer here was not to be the end-user of the goods. As a distributor to retail, its interest was to place inventory that would be most saleable to the customers of the retailer-clients with which it was in privity. Thus, the Defendant's purposes can be best defined by reference to the end-customers' needs, preferences, or desires. From that base, one can identify two variant purposes for the goods here. They fall on separate levels of specificity.

At the broader and more basic one, a CD or a cassette tape is used for the fruits of playing its content-hearing recorded music, the songs or pieces identified on its packaging. In its barest essence, making such sounds emerge from playing equipment is the "ordinary purpose" for which a normal retail buyer would use pre-recorded CDs and cassettes. The Defendant does not complain that the recording media here are physically defective, or otherwise incapable of producing musical sound if placed on the appropriate equipment. If the "general purpose" is defined by simple mechanics and acoustics, the Defendant has not proved that the goods in question here would not serve it.

One can envision a second, higher level of purpose relevant to the assessment of

merchantability here: enabling the playing of music of a specific identity, caliber, or nature. The nature of the warranty means that this sort of purpose cannot be framed or applied in a vacuum. It must be defined against the characteristics of a hypothetical "normal buyer"; and in the case of standard consumer goods this necessarily presupposes a non-specialized market, in which a wide variety of customer tastes would be present.

To some extent this point underlines the poor fit between the conceptual underpinnings of the warranty of merchantability and the Defendant's very specific, content-based contentions with the goods. Nonetheless, one way to apply the warranty can be conceived here, in a way that would meld the variety of merchantability defined by the content of packaging with the "ordinary-use" variety. It would spring from a reasonable assumption: word of the true nature of fraudulently-packaged goods would spread among an end-customer demographic, hampering its saleability at retail; hence, such product would not have long-term marketability for a distributor. The threshold fact issue for this conception of merchantability would be the identity, caliber, and nature of musical content *reasonably to be anticipated* by the hypothetical "normal" retail buyer of the particular title, under all of the circumstances.

This abstruse concept is more likely to be what the Defendant was driving at. Under the Defendant's generalized theory, it seems to envision a retail buyer utterly counting on getting all-original-artist content on the one hand, and 100 percent safe, family-oriented themes and content on the other, from reading the contract description or seeing the packaging of the recordings. Since the Defendant's needs were derivative of its end-customer base's interests, one must hypothesize the perspectives of both a "normal" buyer at retail, and a distributor with the resources of the Defendant. Just what would either such buyer think it was getting in content, were it presented with the contract description—i.e., the bare title presented on the Plaintiff's lists-or the CD or cassette itself?

Viewed in this light, the record does not bear out the Defendant's theory on merchantability. The lists in the contract described any given title quite sparsely. Nonetheless, the coy series titling of the *Feel the Buzz* releases was enough in itself to raise a suggestion of drug-related content. The likelihood was even stronger in conjunction with the more provocative subtitles of the individual discs; the double-entendres virtually leap out. Finally, the series packaging was utterly explicit in its identification of drugs in several songs' titles, regardless of one's familiarity with their lyrical content. A "normal" buyer would have reason to know the discs' content, and could have avoided them were they not to their preference. .

As to the sound-alike releases, the point is made more by the lack of deceptive packaging than it is by affirmative disclosure, but that is solid enough. Almost none of the line-entries on the Plaintiff's lists give any indication of the identity of recording artists, original-artist or sound-alike band.[21] None of the sound-alike collections had the word "original" in their titles, on the packaging or in the truncated form of the Plaintiff's lists. None of them gave the names of original recording artists on the front, or adjacent to the listing of song titles on the rear of the CDs'

21. The only exceptions were when an original artist's name appeared in an item's title. None of those titles are at issue here.

labels. The Defendant produced no evidence-expert or lay-that an ordinary retail buyer would reasonably expect original-artist content from either the wording of the Plaintiff's list or the packaging of the items themselves. Nor did it prove that such items would be rejected out of hand and across the board if placed somewhere at retail.

Thus, there simply is no basis to find that these items would not pass in *some* sector of distribution or retail trade under the contract description and their packaging, that there would not be a group of potential buyers within the range of "normal" consumers of recorded music, or that they were presented on the retail level under any overt misrepresentation of their content.[22]

On the basic level of playability, the goods in question were merchantable and the Plaintiff did not breach its implied warranty that they would be. If in context merchantability extends to the goods' artistic content, the Defendant has not shown that there was a reasonable expectation of particular content, thematic or by identity of artist. Thus, one cannot even hold that there was a warranty to that effect. In short, the Defendant has not made out a breach of an implied warranty of merchantability by the Plaintiff as to any aspect of these transactions.

### C. Implied Warranty of Fitness for Particular Purpose

Under the authorities summarized earlier, the application of the implied warranty of fitness for a particular purpose requires a more subjective and individualized inquiry. The finder of fact must determine the seller's awareness of the buyer's intended purposes for the goods, and the buyer's reliance on the seller to tailor the selection of the goods to those purposes. The statutory wording "any reason to know" suggests that a buyer asserting breach need not prove actual knowledge of these matters on the part of the seller. All it need show is that the seller was aware of enough facts to put it on notice of the two ultimate points.

The facts at bar merit a split treatment of this warranty, as applied to the two disputed categories of goods.

### 1. The *Feel the Buzz* Titles

▪ When Robertson emphasized the Defendant's "highly conservative" standards for theme, content, and packaging to Mark Elfenbein, he put the Plaintiff on notice of the Defendant's particular purpose for any music inventory it would purchase. That purpose was to place the stock with retailers who would be servicing an older, more traditional, family-oriented customer base. In context, there would have been only one reason for Robertson to have said this: to make a tacit request to the Plaintiff that it screen the titles it was offering to the Defendant, and then advise the Defendant of any selections that would be offensive to customers in the end demographic. The Defendant communicated this particular purpose by Robertson's express advisory on its standard and by the clear import of the advisory.

This, in turn, unequivocally implied that the Defendant would rely on the Plaintiff to exercise some level of judgment in reviewing the content of the Defendant's orders, at some point in its processing. Though neither of the Defendant's witnesses ever testified to actually relying on the Plaintiff's employees to do so, the fact of such reliance is readily inferred from all the circumstances. Robertson having

---

**22.** It was clear from both sides' evidence that sound-alike recordings are accepted, marketed, and purchased in some sectors of the general retail market, as are recordings of more unorthodox, risque', or "contraband" subject matter.

raised the point as strongly as he did, and the Elfenbeins not having demurred, the Defendant's proceeding with an order is explicable only if the Defendant actually relied.

Standing alone, this series of facts would make the basis for an implied warranty of fitness for a particular purpose, as it would pertain to the Defendant's contention with the *Feel the Buzz* titles.

## 2. The Sound–Alike Recordings

■ There is a different result for the sound-alike titles, however. Nothing in the record indicates that anyone from the Defendant ever communicated to the Plaintiff that the Defendant would not accept and market sound-alike recordings, or that that form would be unacceptable to the Defendant's end-customer demographic.

To be sure, Pettus testified at some length about the Defendant's standards for packaging its own sound-alike releases. It was clear that he and the Defendant had a real ethic on the issue, the goal of which was to avoid any confusion on a retail customer's part over whether it would be getting compilations of original-artist performances. However, there is no testimony on an implementation of this standard to correspond to Robertson's advisories on thematic content. The Defendant never put the Plaintiff on notice that it would have the particular purpose of placing inventory for resale to customers who would not accept sound-alikes, or who would react negatively to having purchased sound-alike recordings that lacked a sufficiently overt disclaimer of their nature on their packaging. Never having put the Plaintiff on notice to that effect, the Defendant cannot maintain an implied warranty of fitness for a particular purpose as to the inventory with sound-alike content.

## D. Exclusion of Warranties

■ However, to the extent that either statutory implied warranty would have lain as to either component of the disputed inventory, it was deactivated before delivery by the language of exclusion written into the parties' contract. The Defendant does not dispute that the exclusion met the statutory requisites of form and content. Its only argument on this issue is that the terms of the memorandum applied the exclusion to the first order only. As noted earlier, however, the memorandum simply did not reflect such an intention. In context, the parties clearly intended the writing to memorialize all of their ongoing terms for sales of inventory on credit, perforce including the exclusion of warranties.

The surrounding circumstances reinforce this conclusion. Pettus was privy to enough material information that the Plaintiff's situation was unmistakable. It was obvious that the Plaintiff was motivated to reduce as much inventory to cash as possible, and to otherwise make itself as liquid as it could. The offer of lowered prices coupled with a demand for quick turnaround on an order, the rag-tag assortment of listed titles, the explicit presence of "closeout" merchandise on the lists, the push to clean out the Indiana warehouse, and the detail of the industry gossip on the Plaintiff's financial woes, cumulated to a consistent picture: a seller that would want no later grief over inventory it had cleared out. With that background, it would have been sheer folly for the Plaintiff to have set itself up for warranty claims on merchandise it had shipped; returns of inventory and mandated payment on warranty claims would have reversed its drive toward liquidity. The prominence of the exclusion of warranties would put any sophisticated buyer on adequate notice that all sales were to be final. By reviewing the samples and having the *ama-*

zon.com listings available, the Defendant had enough options to content itself upfront, before the sale, that it would get only what it wanted.

Properly presented as it was, the exclusion of warranties in the parties' contract is fully enforceable. It bars the Defendant from asserting any claims for breach of the statutory implied warranties.

### E. Revocation of Acceptance [23]

■ As noted earlier, a buyer may undo a sale of goods after its acceptance of them, where it finds a nonconformity of the goods that was not discoverable before or upon acceptance.[24] The breach arising from the artistic content of the *Feel the Buzz* titles, was a nonconformity that would have empowered the Defendant to revoke its acceptance of those items.[25]

The question then is whether the Defendant seasonably revoked its acceptance of these items.[26] Under all the circumstances, it did not.

The Defendant had the staff and physical ability to inspect the goods on delivery, but it did not do so. Under the cases, the Defendant then had the onus to show that the lapse of time until it did inspect the shipment was reasonable under the circumstances. To the extent that the custom-or-trade-usage override of *GNP Commodities* is viable under Minnesota law, the Defendant did not prove up a basis in fact for it. The testimony on the Defendant's procedures for processing of received shipments through its annual inventory cycle established only an internal, company-specific schedule; it did not go to whether this was an established, accepted practice in the distribution sector of the music industry. The nature of the disputed inventory should have prompted a much earlier inspection. The Defendant and the Plaintiff both dealt in the stuff of pop culture; a substantial fraction of their offerings were subject to the ephemerality of current hit songs. The marketability of collections of such material, whether original-artist or sound-alike, can erode substantially in short periods of time, and

---

**23.** The holding just made on exclusion of the statutory warranties bars the Defendant from maintaining any contentions over the goods in question. Arguably, the discussion under the UCC should stop here. However, the remaining issue argued by the parties under Article 2 will be treated; its outcome only reinforces the result in favor of the Plaintiff on all the other theories.

**24.** The parties did not directly argue the issue of whether the Defendant could have discovered a nonconformity based on artistic content before actually taking down the packaging of the order. The Plaintiff's counsel made the point in passing, that the availability of information on content from the *amazon.com* Website defused this whole issue, depriving the Defendant of *any* right to revoke acceptance. There is much to be said for this position, but no one developed it at length. In any case, there is no dispute that the Defendant had to remove heavy shrink-wrapping and to disassemble large pallet loads before it could physically inspect the actual goods—

and that could not be done until it had physically assumed control of the goods.

**25.** While Minn. Stat. § 336.2–608(1) does not expressly cross-reference the statutory implied warranties, it best harmonizes Article 2's provisions to hold that a violation of one of the warranties is perforce a nonconformity that could justify revocation of acceptance. This conclusion is suggested by a simple application of logic and common sense. A failure of goods to function in ordinary use—that is, unmerchantability—would certainly impair their intrinsic value to a buyer in a substantial way. So would their failure to meet the specific needs of the buyer—that is, a lack of fitness for particular purpose.

**26.** The Plaintiff does not dispute that Murchison's communications to Swenson are facially sufficient to constitute a revocation of acceptance, even though Murchison never stated that the Defendant was ready to return the disputed inventory.

might not revive until the songs achieve the status of oldies, years or decades later. To enable the Plaintiff to recover some value on such material via subsequent resale, it would have been only fair to inspect and act in revocation of acceptance very soon after taking delivery. Given the nature of the goods, and the feasibility of prompt inspection, taking nearly six months to do so was outside the pale of reasonableness.[27]

The delay was even more egregious in context. Pettus knew about the Plaintiff's financial distress as early as the date of the first order. By the time the second order was delivered, Pettus knew that the Plaintiff was in Chapter 11, and he and Robertson were aware of enough other circumstances to raise the possibility that their company would receive inventory that no one else had found attractive. Rather than taking special pains to remedy a breach that might arise from that circumstance, Pettus merely directed a slowdown in payment to the Plaintiff.

This hedge for any "defects" in the merchandise was to run for some unspecified period of time. Pettus did this at the same time that he kept the Defendant on its own regular, methodical, but slow process of inventory processing. This meant that the Defendant held back a substantial fraction of the contemplated monetary consideration for the order *and* kept the physical possession of all of the goods it had ordered. It was not coincidental that this boded to put the Plaintiff in a weaker position in several ways: in its status as a debtor in Chapter 11, in need of cash to enable its administration of the estate; in its role as a potential competitor with the Defendant; and, finally, vis-a-vis the Defendant in negotiations for the resolution of any dispute over the order that the

Defendant might start later. Viewed in light of the Plaintiff's concurrent weakness, it was even more unreasonable to defer inspection of the goods for as long as the Defendant did.

All of this establishes that the Defendant should have discovered the nonconformity it asserted shortly after its acceptance, much earlier than it actually did. When stacked onto the two weeks in August that it took Robertson and Murchison to finalize the Defendant's communications to Swenson, the intervening period of over five months was not the "reasonable time" that MINN. STAT. § 336.2–608(2) contemplates. If the Defendant had a contention with any of the inventory, and particularly with the *Feel the Buzz* titles, the Plaintiff had a right to know of that much sooner.

As a result, the Defendant's revocation of its acceptance was not effective. To the extent that there was an actionable breach not excluded by the parties' contract, the Defendant nonetheless is not entitled to any of the remedies that it has asserted, vis-a-vis the sale's finality.

### F. Common–Law Fraud

The Defendant's common-law fraud theory appears to be premised entirely on its assertion that Mickey Elfenbein told Pettus that the Plaintiff had "more of the same" original-artist inventory when he approached the Defendant for a second order. To the extent that common law lies independently of the governance of Article 2 here, this theory fails. Mickey Elfenbein did not make this statement. There was no representation-the most basic predicate of actionable fraud. The Defendant has no defense or affirmative remedy under this general theory.

---

**27.** The Defendant received all of the *Feel the Buzz* inventory in the first order; the lapse of time between receipt and Murchison's protest ran from late February to late August, 2000.

### G. Deceptive Trade Practices

■ In brief and argument, the Defendant was a bit vague about the specific nature of the content or representations on which it was basing its claim that the Plaintiff had engaged in deceptive trade practices. The three possible exemplars that come to mind, however, are not borne out by the record.

In the first place, Mickey Elfenbein did not represent that the content of the second offering was the same original-artist inventory that the Defendant had ordered in the first transaction; there was no palming-off of unacceptable merchandise induced by such a statement. In the second place, there is no evidence that anyone from the Defendant ever relied on any aspect of the packaging of the sound-alike titles before Robertson placed the second order. The packaging itself may not meet the higher-and laudable-standards for explicit disclosure of non-original-artist content that the Defendant applies to its own sound-alike releases. Nonetheless, none of the packaging of any of the sound-alike releases in evidence has any overt representation of original-artist content. The external packaging is virtually silent as to the individual identity of the recording performers. This is not a circumstance likely to create confusion on a retail customer's inspection; any casual buyer of recorded music knows that major labels' compilation recordings carefully recite the names of featured artists on their faces. The absence of such recitations gives notice that, at the least, further inquiry would be appropriate.

Finally, there was no material likelihood of confusion as to the thematic content of the *Feel the Buzz* CDs, from either the entries on the Plaintiff's lists or the items'

packaging. The packaging is unmistakable on the point. Its ready availability for review on the *amazon.com* website totally undercuts any complaint of subterfuge. The bare titles of the three releases are enough to raise the effluvium of drug-related content. Even granting their coy ambiguity,[28] the subsidiary phraseology is enough to raise a flag for any reviewer. The media of our time have spread the street argot of controlled-substance use just that far; no one in the general popular music industry could credibly claim to be ignorant of it or its stylistic artifices.

No other bases for a deceptive-trade-practices analysis come to mind. These ones are not enough to make out a *prima facie* case. The Defendant has no right to relief under this statute.

### H. Consumer Fraud

Given the way in which the Defendant melded its arguments under the Uniform Deceptive Trade Practices Act and the Prevention of Consumer Fraud Act, the same analysis is applicable to the latter provision. The Defendant has no right to relief under this alternate theory either.

### III. CONCLUSION

The Plaintiff made out a *prima facie* case for the collection of its account receivable from the Defendant, based on its proof of delivery of goods as provided under the parties' contract of sale. The Defendant has not demonstrated an exit from liability for the full demanded amount, whether via defense or counterclaim for breach of warranty and revocation of acceptance, or under the three theories for affirmative relief that it asserted in its counterclaim.[29] The Plaintiff, therefore, is entitled to judgment in the amount it demands.

---

**28.** Borne out, unfortunately, by Robertson's hasty conclusion.

**29.** The Defendant did not direct any of its evidence toward the eight affirmative defenses that it had pleaded in a cursory way, nor

## ORDER FOR JUDGMENT

On the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Plaintiff shall recover from the Defendant the amount of $95,908.25, with the following additions and subtraction:

a. plus interest at the rate provided by the parties' contract;

b. plus such costs and disbursements as the Plaintiff may hereafter tax pursuant to applicable statute and rule; and

c. less the sum of $516.50 as previously awarded to the Defendant in the disposition of its motion for imposition of sanctions in connection with the discovery process.

LET JUDGMENT BE ENTERED ACCORDINGLY.

did it develop any legal argument on them. These defenses are deemed abandoned, via the failure to actively present them.